## COMMONWEALTH *vs.* JOHN GOOD, JR.

Middlesex. December 4, 1990. - March 28, 1991.

Present: LIACOS, C.J., WILKINS, ABRAMS, O'CONNOR, & GREANEY, JJ.

*Practice, Criminal*, Required finding, Grand jury proceedings, Indictment, Dismissal, Conduct of prosecutor, Disclosure of evidence, Argument by prosecutor, Capital case. *Homicide. Grand Jury. Evidence*, Grand jury proceedings, Relevancy and materiality, Cross-examination.

At the trial of an indictment charging murder in the first degree, the judge's denial of motions for a required finding of not guilty on so much of the indictment as charged murder in the first degree did not give rise to a substantial likelihood of a miscarriage of justice, where there was sufficient evidence to support a finding by the jury that, before the victim was shot, the defendant at least briefly reflected on his resolution to kill the victim. [617-618]

The integrity of a grand jury proceeding, in which indictments for murder and unlawfully carrying a firearm were returned, was not impaired by the prosecutor's inappropriate and unnecessary display before the grand jury of a wanted poster bearing the defendant's photograph, where the poster was cumulative of information already presented to the grand jurors, where any additional information on the poster was not known to the grand jurors because they were not given an opportunity to read it, and where the record reflected that there was no particular interest on the part of the grand jurors in the poster. [618-620]

At a murder trial, no substantial likelihood of a miscarriage of justice was demonstrated by the judge's denial of the defendant's motion in limine seeking to bar the introduction of any evidence of the shooting of a cat that preceded the shooting of the victim, or in the admission of the evidence at trial, where there was sufficient evidence linking the defendant to the shooting of the cat, where the evidence was relevant, and where the evidence was not unfairly prejudicial. [620-622]

At a murder trial, the judge did not abuse his discretion in restricting the defendant's cross-examination of the victim's ex-wife, where the evidence that the defendant sought to introduce was irrelevant. [622-623]

At a murder trial, the defendant was not prejudiced by alleged improprieties in the prosecutor's closing argument. [623-626]

INDICTMENTS found and returned in the Superior Court Department on September 24, 1986.

A motion to dismiss and a motion to suppress evidence were heard by *J. Harold Flannery*, J., and the cases were tried before *Guy Volterra*, J.

*John J. Courtney* for the defendant.

*Patricia M. Darrigo*, Assistant District Attorney, for the Commonwealth.

GREANEY, J. A jury in the Superior Court convicted the defendant of murder in the first degree by reason of deliberate premeditation and of unlawfully carrying a firearm. On appeal, the defendant claims error in: (1) the denial of his motions for required findings of not guilty; (2) the denial of his motion for dismissal of the indictments; (3) the denial of his motion in limine; (4) the restriction of his cross-examination of a Commonwealth witness; and (5) the prosecutor's closing argument. The defendant also requests relief under G. L. c. 278, § 33E (1988 ed.). We conclude that there is no basis for a new trial or for relief pursuant to G. L. c. 278, § 33E. Accordingly, we affirm the judgments of conviction.

A detailed recitation of the evidence at trial is necessary to a full analysis of the appeals before us. We start with an overview of the circumstances of the crimes, then we describe in more detail the Commonwealth's identification evidence.

A. *Overview.* The jury could have found the general circumstances of the crimes to be as follows. About noon on July 27, 1986, the victim, Robert Perry, was walking along Cambridge Street in Cambridge, near its intersection with Maple Avenue, when he was shot three times. A thin white man carrying a handgun ran from the location of the victim's body to a Pontiac automobile bearing Massachusetts registration plate number 104MND. The Pontiac sped away down Maple Avenue. At a nearby intersection, the driver of the Pontiac disregarded a stop sign and collided with another car. The front seat passenger in the Pontiac (a thin white man) then left the car and walked briskly away. None of the witnesses testifying to these facts actually observed the shooting of the victim. Nor was there any physical evidence

linking the defendant to the Pontiac. The murder weapon was never found. The main issue at the trial, therefore, was identification.

B. *Identification evidence.* The Commonwealth offered the testimony of a number of witnesses as circumstantial evidence in support of the conclusion that the defendant was the gunman. Officer Edward Quinton of the Cambridge police testified that he saw the defendant in a Cambridge Street tavern in the early morning hours of the day of the shooting. The defendant was with two other people, one of whom, Gary Stewart, was the operator of the Pontiac that later that day left the vicinity of the shooting and was involved in the collision.[1] Officer Quinton did not see the defendant leave the tavern and did not see him get into a car.

Frank Russell, Jr., who worked not far from where the shooting occurred, testified that he was walking down Cambridge Street at about 8 A.M., roughly four hours before the shooting. Russell had just walked past a parked car on which a cat was sitting when he heard two shots. He turned, saw that the cat had been shot, and that the front seat passenger in a passing Pontiac (registration number 104MND) was in the process of drawing in his arm through the open car window. The passenger held a handgun. Russell testified that the passenger was "skinny," but that the only description that he gave the police officer who responded to the scene was that "the driver was heavyset. That's all he asked me." The Commonwealth stipulated, however, that the officer would testify that Russell told him at the scene that "a heavy-built passenger" shot the cat.

Witnesses William Thomas and Thomas Scott were in the area of the shooting when it occurred. (Thomas was in his apartment; Scott was in a nearby park.) They testified about the events that they observed after hearing the sound of gunshots. Both saw a man running to the Pontiac (Thomas recorded the registration number); both saw the car speed

---

[1]The defendant's motion to sever his trial from that of his codefendant, Gary Stewart, was allowed.

down Maple Avenue. Thomas saw a gun in the man's hand; Scott said the man appeared to be carrying something. The two gave different descriptions of the man. Thomas described him as "skinny," with "dirty blond" hair, six feet tall, between 160 and 170 pounds, and wearing a striped, button-down shirt. Scott described him as five feet, nine inches tall, 175 pounds, with dark brown hair, and dark clothes. Although both witnesses identified the defendant at trial, there was evidence that both had difficulty identifying the man they had seen from photographic arrays. When Thomas first examined a police array of ten photographs, including one of the defendant, he was unable to make an identification. Scott also examined an array of photographs. He chose two photographs, one of the defendant and one of another man, and indicated that the man that he had seen had a combination of the features in both photographs.

Two other witnesses, Cheryl Berggren and Richard Rosen, were in the car that was struck by the fleeing Pontiac shortly after the shooting. Berggren testified that, after the collision, the front seat passenger in the Pontiac said to the operator words to the effect of, "I'm getting out of here," and began to walk away. The departing passenger was thin, "shorter than average," and had "very dark" hair. There was evidence that, like Thomas and Scott, Berggren also had some difficulty in choosing the defendant's photograph from a police array. After reviewing an array, she chose two photographs (including one of the defendant) as close; then, when pressed, she selected the photograph of another man, not the defendant. At trial, she could say only that the defendant "look[ed] like" the man that she saw walk from the car. Richard Rosen, the front seat passenger in Berggren's car whose eyeglasses were knocked off in the collision, described the passenger in the Pontiac as having dirty blond hair, and standing between five feet, six inches and six feet tall. Rosen looked at several police photographic arrays before the trial. When viewing the first of these arrays, Rosen did not select the defendant's photograph. In fact, he chose the photograph of another person in the array as looking most like the man

he had seen. Like Berggren, Rosen made a somewhat qualified identification of the defendant at trial, saying that the defendant looked "very much like" the man he had seen at the collision site.

Three other witnesses who were walking near the intersection at the time of the collision also testified. Only one of the three identified the defendant at trial.[2] Their descriptions of the man they had seen were different, and also differed somewhat from the descriptions given by the other witnesses.

Two police officers arriving on the scene of the shooting were allowed to testify to statements made to them by three additional eyewitnesses.[3] Susan Sung told Officer George P. Blair that she looked out her window after hearing shots and saw a tall, thin, blond-haired man run down Maple Avenue. The man was wearing baggy blue pants and had a gun in his hand. Gerard Michael told Officer Blair that he was about one block away on Cambridge Street when, after hearing several loud cracks, he saw an approximately six-foot tall blond man wearing blue trousers run down Maple Avenue. Linda Lundgren told Detective Francis X. Gutowski that she was outside near the location of the shooting and heard three sharp sounds. She turned and saw a white man, five feet, ten inches to six feet tall, with "dirty blond" hair running down Maple Avenue.[4] Apparently, none of these three witnesses at the scene specifically identified the defendant (through photographic arrays or otherwise) as the man they had seen.

---

[2]This particular witness also admitted that, at a pretrial hearing, she had confused the defendant's trial counsel with a police officer who had shown her an array of photographs.

[3]The record is not explicit on this point, but it is clear that, by the time of trial, these witnesses were unavailable, and that defense counsel had agreed that their testimony could come in through the two officers (presumably because their perceptions conflicted somewhat with the testimony of other witnesses). In their briefs here, the parties agree that these witnesses were unavailable.

[4]Ms. Lundgren also spoke to another police officer. She told this officer that the man she saw was six feet tall, blond, and was wearing baggy, "hospital blue" pants and shirt.

This in essence was the Commonwealth's identification evidence. The Commonwealth also offered evidence that the defendant did not return to his job in Cambridge after the day of the shooting, and did not return to his parents' apartment (where he had been living). The defendant was arrested in South Boston approximately two months later.

1. *Motions for required findings.* At the trial, the defendant moved for required findings of not guilty on the ground that the Commonwealth's evidence of the identity of the gunman was insufficient. On appeal, however, the defendant has not briefed this point. We therefore consider it waived. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975). Instead, the defendant now argues that the judge erred in denying his motions because there was no legally sufficient evidence of premeditation. Because this contention was not made below, however, we consider only whether the denial of the motion gave rise to a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Gallagher*, 408 Mass. 510, 520 & n.19 (1990).

"In reviewing the denial of a motion for a required finding of not guilty, we consider whether 'the evidence is insufficient as a matter of law to sustain a conviction on the charge.' Mass. R. Crim. P. 25 (a), 378 Mass. 896 (1979). '[The] question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' . . . 'Thus, to sustain the denial of a [motion for a required finding], it is not enough for the appellate court to find some record evidence, however slight, to support each essential element of the offense; it must find that there was enough evidence that could have satisfied a rational trier of fact of each such element beyond a reasonable doubt.'" (Citations omitted.) *Commonwealth* v. *Mazza*, 399 Mass. 395, 398-399 (1987). As the defendant challenges the sufficiency of the evidence of premeditation, we inquire whether there was sufficient evidence that the defendant reflected at least briefly on his resolution to kill. See, e.g., *Commonwealth* v. *Ruci, ante* 94, 96 (1991); *Commonwealth*

v. *Basch*, 386 Mass. 620, 622 (1982) ("[d]eliberate premeditation [can] be present even if the killing followed reflection by only a few seconds"), and cases cited.

Applying these principles in this case, we conclude that the judge did not err in denying the defendant's motions. There was evidence from which a rational trier of fact could infer that the defendant, armed with a handgun, left a parked car, approached the victim (crossing the street to do so), and shot him at close range. Three bullets were fired; all struck the victim in vital areas, including the back of the head. This was sufficient evidence to support a finding that, before the shooting, the defendant at least briefly reflected on his resolution to kill the victim. See *Commonwealth* v. *Ruci, supra*; *Commonwealth* v. *Robertson*, 408 Mass. 747, 757 (1990); *Commonwealth* v. *Storey*, 378 Mass. 312, 325-326 (1979). For this reason, there was no likelihood of a miscarriage of justice in the denial of the motions for required findings of not guilty.[5]

2. *Motion to dismiss indictments.* The Commonwealth presented its case to the grand jury through testimony of an investigating officer from the Cambridge police department. The prosecutor instructed the officer to bring with him to the presentation a wanted poster bearing the defendant's photograph. At the conclusion of the officer's testimony, the poster was displayed briefly to the grand jury, but they were not given an opportunity to read it or examine it closely.

Based in part on this conduct, the defendant moved to dismiss the indictments, arguing that the use of the wanted poster impaired the grand jury. After a hearing, the motion judge denied the motion. He reasoned that the presence of the wanted poster did not diminish the credibility of the

[5]The defendant's argument that there was no evidence that the shooting was other than an unplanned "happenstance" is beside the point. It may well be (as one could infer from the evidence at trial) that the defendant did not plan in advance to kill the victim at the exact time and place of the shooting. Nevertheless, there was sufficient evidence from which a rational trier of fact could conclude that, as he approached the victim, the defendant resolved to kill him. This was enough to warrant denial of the motions.

properly introduced evidence and could not have materially influenced the grand jury's decision to indict. The judge did note, however, that, notwithstanding his conclusion on the issue, it was "wholly inappropriate" for the prosecutor to have presented the wanted poster, and the prosecutor came "dangerously close" to violating the principle that the Commonwealth's interest in prosecuting a criminal case is to see that justice is done, not that it wins its case. Here, the defendant renews his argument that the presentation of the poster requires dismissal of the indictments.

Generally, absent "extraordinary circumstances," we will not inquire into the adequacy or competency of evidence before a grand jury. However, we will consider whether the evidence presented to a grand jury was sufficient to support a finding of probable cause, and we will examine whether the defendant has shown that the integrity of the grand jury proceedings has been impaired. See *Commonwealth* v. *Freeman*, 407 Mass. 279, 282 (1990); *Commonwealth* v. *Mayfield*, 398 Mass. 615, 619-620 (1986). The defendant does not contend, and could not on the evidence before the grand jury, that there was insufficient evidence before the grand jury to support a finding of probable cause, *Commonwealth* v. *McCarthy*, 385 Mass. 160, 163 (1982), so we are concerned here only with the question whether the prosecutor's conduct impaired the integrity of the grand jury proceedings.

The evidence presented to the grand jury in this case consisted of the testimony of the Cambridge police officer in charge of the investigation of the shooting. He described the general circumstances of the crime, and he stated that two witnesses had identified the defendant as the man seen running from the scene. The officer also testified that the police began searching for the defendant soon after the shooting, and that a warrant was obtained for the defendant's arrest within days of the shooting. After this testimony, the wanted poster was briefly displayed. The members of the jury had no questions, did not ask to see the poster, and were dismissed.

As the motion judge noted, the use of the poster was entirely inappropriate and unnecessary. At most, the poster told

the grand jurors what they already knew from the witness's testimony — that the Cambridge police considered the defendant responsible for the victim's murder and, in the two-month period after the shooting, wanted very much to locate him. Thus, in addition to being highly inflammatory, the poster was devoid of evidentiary value. If the prosecutor was concerned about the persuasiveness of the evidence that the testifying officer offered, he could have called any of the several other witnesses listed above to bolster his presentation. By using the poster, the prosecutor unfairly took advantage of the grand jury proceedings and risked creating reversible error.

The poster was revealed at the conclusion of the presentation and was cumulative of information already presented to the grand jurors. Any additional information on the poster was not known to the grand jurors because they were not given an opportunity to read it. Moreover, the record reflects that there was no particular interest on the part of the grand jurors in the poster. In these circumstances, although the poster should not have been displayed to the grand jury, the fact that it was did not impair the integrity of the grand jury proceedings so as to warrant dismissal of the indictments. See *Commonwealth* v. *Freeman, supra* at 283; *Commonwealth* v. *Shea,* 401 Mass. 731, 734-735 (1988); *Commonwealth* v. *Champagne,* 399 Mass. 80, 84 (1987); *Commonwealth* v. *Mayfield, supra* at 621-622.

3. *Motion in limine.* The defendant filed a motion in limine to bar the introduction of any evidence of the shooting of a cat that preceded the shooting of the victim. The defendant argued that the testimony of Frank Russell was irrelevant and, even if relevant, unfairly prejudicial. The judge denied the motion after a hearing. The evidence was introduced at trial without objection by the defendant.[6]

---

[6]Because the defendant did not renew his objection to the admission of this evidence at trial, we consider only whether it created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Shea,* 401 Mass. 731, 740-741 (1988); *Commonwealth* v. *Gabbidon,* 398 Mass. 1, 7 (1986).

" 'The relevancy of proffered evidence depends on whether
it tends to prove some issue in the case on trial.' *Common-
wealth* v. *Chretien*, [383 Mass. 123,] 135 (1981). 'Evidence
need not establish directly the proposition sought; it must
only provide a link in the chain of proof.' *Commonwealth* v.
*Tobin*, 392 Mass. 604, 613 (1984)." *Commonwealth* v.
*Gordon*, 407 Mass. 340, 351 (1990). "We accord the judge
substantial discretion in deciding whether evidence is rele-
vant, and whether the prejudicial implications of such evi-
dence outweigh its probative value." *Commonwealth* v.
*Tobin*, *supra*. "[W]hile evidence of other . . . wrongful be-
havior may not be admitted to prove the character or propen-
sity of the accused as enhancing the probability that he com-
mitted the offence . . . it is admissible for other relevant
probative purposes." *Commonwealth* v. *Chalifoux*, 362
Mass. 811, 815-816 (1973).

The defendant argues here that the evidence should have
been excluded because: (1) there was no evidence linking the
defendant to the cat's shooting; (2) the evidence was irrele-
vant; and (3) the evidence amounted to unfairly prejudicial
prior bad act evidence. We discuss these points in turn. First,
there was sufficient evidence linking the defendant to the
shooting of the cat. Some hours before the shooting, the de-
fendant was seen with Gary Stewart, the driver of the Pon-
tiac from which the shots were fired. An eyewitness to the
cat's shooting described the passenger in the front seat (who
was holding a handgun) as a thin white male, and the driver
as heavyset. This description corresponded with descriptions
that other witnesses gave of Gary Stewart and the passenger
in the Pontiac after it collided with the Berggren vehicle.
Some of these witnesses identified the defendant as the pas-
senger from the Pontiac. Lead testing of the window frame
on the Pontiac's passenger side confirmed that shots had
been fired from that window. This was enough evidence to
connect the defendant to the cat's shooting.

Second, the evidence was relevant. It had a rational ten-
dency to prove identity — the only seriously contested issue
at trial. Russell's testimony had a tendency to show that,

only hours before, the defendant was armed and in the area where the victim was killed. In addition, Russell's description of the circumstances of the cat's shooting corresponded in part with descriptions of the gunman and the car that other witnesses observed at the shooting of the victim, and therefore (beyond its independent value) corroborated their identifications of the defendant. This was sufficient to pass the relevance threshold.

Third, and finally, we cannot say that the evidence was unfairly prejudicial. Although the evidence suggested that the defendant used a gun in a cruel, reckless, and perhaps criminal fashion, the judge reasonably could have concluded that the probative value of this evidence outweighed any prejudice due to its admission. There was no likelihood of a miscarriage of justice in the denial of the defendant's motion in limine, or in the admission of the evidence at trial.

4. *Restriction on cross-examination.* During his cross-examination of the victim's ex-wife, defense counsel asked whether she could remember seeing the victim in the company of other persons in the months preceding his death. (Counsel intended to show that two of the victim's acquaintances at the time of the shooting resembled the descriptions given of the gunman.) The prosecutor objected as to the relevance of the questioning and the judge sustained the objection. The defendant now contends that this decision was an abuse of discretion.

As stated above, trial judges have substantial discretion to determine whether evidence is relevant. See *Commonwealth v. Tobin,* 392 Mass. 604, 613 (1984). We will accept the judge's conclusion regarding the relevance of proffered evidence absent palpable error. See *Commonwealth v. Booker,* 386 Mass. 466, 470 (1982). There was no such error in this case. The fact that the victim had acquaintances who may generally have fit the description of the gunman given by some of the Commonwealth's witnesses had no tendency to prove that they were involved in the shooting or that the witnesses had misidentified the defendant. Therefore, the evidence that the defendant sought to introduce was irrelevant.

Cf. *Commonwealth* v. *Mandeville*, 386 Mass. 393, 398-399 (1982); *Commonwealth* v. *Chretien*, 383 Mass. 123, 136-138 (1981). The judge did not abuse his discretion in restricting the defendant's cross-examination.

5. *The prosecutor's closing argument.* The general standards for the evaluation of prosecutors' closing arguments have been summarized as follows: "We have never criticized a prosecutor for arguing forcefully for a conviction based on the evidence and on inferences that may reasonably be drawn from the evidence. See *Commonwealth* v. *Earltop*, 372 Mass. 199, 205 (1977) (Hennessey, C.J., concurring). On the other hand, a prosecutor should not refer to the defendant's failure to testify, misstate the evidence or refer to facts not in evidence, interject personal belief in the defendant's guilt, play on racial, ethnic, or religious prejudice or on the jury's sympathy or emotions, or comment on the consequences of a verdict." (Footnotes omitted.) *Commonwealth* v. *Kozec*, 399 Mass. 514, 516-517 (1987). We examine the defendant's challenges to the prosecutor's closing in this case in light of these standards. We also keep in mind that the evidence in the particular case establishes the context for the evaluation of an argument and, as a consequence, "no satisfactory bright line rules can be found or could be written." *Commonwealth* v. *Kozec*, *supra* at 518.

a. There was no unfair appeal to the emotions of the jury made in the prosecutor's comments on the cat's shooting. The argument on the point was brief. Because the evidence of the incident was properly admitted, the prosecutor was entitled to refer to it in a noninflammatory manner (as he did) during his closing.

b. Later in his argument, the prosecutor made the following reference: "Now, [defense counsel] has told you over and over three people, Susan Sung, Gerard Michael, and Linda Lindgren [*sic*]. I'd ask you . . . when you examine this case and we keep hearing these descriptions [of their statements], keep your eye on what this case is all about. Did you ever see them take the stand up here? Did you ever see them testify and tell you what they saw? Were they ever called to the

witness stand in this case? No." Defense counsel objected to the argument and the objection was immediately sustained. At the conclusion of the arguments, defense counsel asked the judge for an instruction clarifying for the jury that the defendant had no duty to call any witnesses. It is evident from the discussion on the issue that the judge did not understand the precise request being made. Defense counsel did not clear up the confusion and, as a result, the judge did not act on defense counsel's request. The defendant now argues that the prosecutor's comments improperly shifted the burden of proof to him.

The prosecutor's argument did not actually state that the defense should have called the eyewitnesses. It seemed to emphasize the point (undoubtedly obvious to the jury) that these witnesses had not appeared in the courtroom at all, but had the substance of their somewhat limited observations repeated by the police officers to whom they talked after the incident. See note 3, *supra.* The witnesses, of course, gave descriptions generally favorable to the prosecution, so it would not have been expected that the defense would call them to the stand.

If we assume the argument may have had the tendency now ascribed to it by the defendant, its effect was negated by the immediate sustaining of the objection to it and the judge's clear and direct instructions on the presumption of innocence and the Commonwealth's burden to prove its case beyond a reasonable doubt.

c. Without objection, the prosecutor remarked that defense counsel had failed to cross-examine two Commonwealth witnesses and, during defense counsel's closing argument, had avoided referring to their testimony. In fact, defense counsel had cross-examined both witnesses and had mentioned both in his summation. The defendant now argues that the prosecutor's argument shifted the burden of proof.

The lack of an objection suggests that defense counsel did not view the argument as prejudicial when made. Considered in light of the entire summation made by the prosecutor, the argument was intended to be a comment on the weakness of

the defendant's attack on the identification evidence. We per-. ceive nothing here that would give rise to a substantial likelihood of a miscarriage of justice.

d. Finally, the prosecutor presented a hypothetical description of the circumstances of the automobile accident as follows: "Now, you've heard Cheryl Berggren . . . [and] Richard Rosen [testify]. . . . They're out driving to . . . Harvard Square. What happens on the way . . . ? This guy, Gary Stewart and his big yellow car, I suggest, who are fleeing from the scene, and I suggest to you . . . isn't it a coincidence that Mr. Good, if you go down Maple Ave . . . about a block, you can run right through the driveway into Highland Park and you're [at the] home [of the defendant's parents]. The gun's down. I'm sitting at home and I'll put on the Three Stooges because I just got away with killing Robert Perry." Defense counsel objected, and the objection was immediately sustained. Very shortly after these remarks, the prosecutor referred to testimony of Cheryl Berggren that, after the collision, the passenger in the Pontiac said, "I'm getting out of here." The prosecutor then stated: "Now, did Mr. Good say anything? The person identified as Mr. Good? I'm getting out of here. Why? Because he just murdered Robert Perry." Again defense counsel objected, and the objection was sustained. The defendant argues that the remarks, taken as a whole, attributed to the defendant an admission of guilt for which there was no direct evidence.

The hypothetical account was for the most part in accord with inferences that could be fairly drawn from the evidence at trial. While prosecutors should use caution in speculating in a particular case what conversation may have occurred, there are occasions when counsel may present an argument by dramatizing it in imaginary dialogue. See *Commonwealth v. Pope*, 406 Mass. 581, 587 (1990). Here, the jury could have inferred that the defendant fled from the scene of the accident because he had just murdered Robert Perry. The jury could have also inferred that the defendant, having just shot the victim three times at close range at noontime on a busy street corner, and having had his getaway foiled, fled to

his parents' home, the nearest and most likely place of refuge. While those portions of the hypothetical account which suggested that the defendant put down his handgun and turned on the television set may have gone beyond the scope of the evidence, they do not rise to a level that requires reversal of the defendant's convictions. *Commonwealth* v. *Richenburg*, 401 Mass. 663, 675 (1988). The thrust of the prosecutor's argument — that the defendant had fled due to consciousness of his guilt — was proper as it was a reasonable inference from the evidence.

The conjecture that the defendant said to himself, "I just got away with killing Robert Perry," was improper. We can fairly assume, however, some measure of jury sophistication with regard to sorting out hyperbole and speculation. See *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 746 (1990); *Commonwealth* v. *Glass*, 401 Mass. 799, 806 (1988). The main purpose of the prosecutor's argument was to remind the jury that the defendant's parents lived within a few blocks of the scene of the car accident and that he easily could have fled to their home after the shooting. This was a permissible point to be made, and we are not persuaded that the jury would have been swept away from the point by anything else that was argued.

The entirety of the prosecutor's argument, therefore, gives no basis for a new trial.

6. *General Laws c. 278, § 33E*. The verdict of murder in the first degree on the ground of deliberate premeditation was proved by the Commonwealth by substantial evidence that suggested that the shooting was planned in advance and carried out according to plan. The crime "resembles a cool execution rather than a frenzied, spontaneous killing." *Commonwealth* v. *Almon*, 387 Mass. 599, 606 (1982). There is no basis on which to exercise the authority conferred by G. L. c. 278, § 33E, to disturb the jury's verdict.

*Judgments affirmed.*