COMMONWEALTH *vs.* GARY STEWART.

Middlesex. September 5, 1991. - December 9, 1991.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, & GREANEY, JJ.

*Homicide. Joint Enterprise. Evidence*, Relevancy and materiality, Prior misconduct, Hearsay. *Practice, Criminal*, Argument by prosecutor, Instructions to jury.

At a murder trial the Commonwealth presented evidence sufficient to prove that the defendant had sufficient knowledge of, and shared, his coventurer's intention to kill or grievously injure the victim. [349-353]

At a murder trial the judge properly allowed evidence of the shooting of a cat by a codefendant several hours before his shooting of the victim, as bearing on the issue of the defendant's knowledge and shared intent. [354]

At a murder trial the judge correctly excluded hearsay evidence proffered by the defendant. [355-356]

In a murder case, no error was demonstrated in the closing remarks of the prosecutor. [356-358]

The judge's instructions to the jury in a murder case with respect to joint venture and murder were correct. [358-360]

INDICTMENT found and returned in the Superior Court Department on August 1, 1986.

The case was tried before *Guy Volterra*, J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Patricia A. O'Neill*, Committee for Public Counsel Services, for the defendant.

*David R. Marks*, Assistant District Attorney, for the Commonwealth.

GREANEY, J. A jury in the Superior Court convicted the defendant, Gary Stewart, of murder in the second degree. The Commonwealth proceeded against the defendant on a joint venture theory, asserting that the defendant had partici-

pated with John Good in the murder of Robert Perry.[1] A
divided Appeals Court reversed the defendant's conviction,
concluding that he was entitled to the allowance of his mo-
tion for a required finding of not guilty because the Com-
monwealth's evidence was insufficient to warrant a finding by
the jury that the defendant knew of, and shared, Good's in-
tent to kill or grievously injure Perry. *Commonwealth* v.
*Stewart*, 30 Mass. App. Ct. 569 (1991). We allowed the
Commonwealth's application for further appellate review.
We conclude that the Commonwealth's evidence was suffi-
cient to warrant the jury's finding that the defendant was
guilty of murder in the second degree as a joint venturer with
Good. We also reject the defendant's arguments claiming er-
ror in: (1) the denial of his motion in limine; (2) the exclu-
sion of testimony from a defense witness; (3) the prosecutor's
final argument; and (4) the jury instructions on joint venture.
Consequently, we affirm the defendant's conviction.

The Commonwealth's evidence permitted the jury to find
the following facts concerning the murder. Around noon on
Sunday, July 27, 1986, Robert Perry was walking along
Cambridge Street in Cambridge. John Good approached
Perry and fatally shot him several times with a .38 caliber
handgun. Good then ran to, and got into, the passenger seat
of a Pontiac automobile bearing the Massachusetts registra-
tion number 104MND. This automobile, driven by the de-
fendant, immediately sped down Maple Avenue. At a nearby
intersection, the Pontiac ignored a stop sign and collided with
another automobile. Good then left the automobile and rap-
idly walked away, telling the defendant that he intended to
leave. The defendant remained with the automobile.

The Commonwealth's case concerning the defendant's
knowledge and intent contained the following evidence. At
about 1 A.M, July 27, 1986, the defendant, Good, and a third,
unidentified man were together at a bar on Tremont and

---

[1]Good was tried separately and convicted of murder in the first degree.
We have already considered Good's appeal and have affirmed his convic-
tion. *Commonwealth* v. *Good*, 409 Mass. 612 (1991).

Cambridge Streets, about four blocks east of Cambridge City Hospital and seven blocks west of Hunting Street. Approximately seven hours later, at about 7:50 A.M., the defendant, Good, and another man were driving west on Cambridge Street near Hunting Street in a yellow or off-white automobile bearing Massachusetts registration number 104MND. The defendant was driving, Good was in the front passenger seat, and the third man was in the back seat. Perry lived on or near Hunting Street. Good also lived in the area.

As the three men drove along, they passed a green automobile parked at the curb. A white cat lay on the hood of the automobile. The defendant turned his vehicle around on Cambridge Street and again pulled abreast of the green automobile. Good pointed a handgun out of the passenger window and shot the cat twice in the neck, killing it. A witness saw Good pull the handgun back into the automobile and heard the three men laugh as the defendant drove off. The witness saw and recorded the registration number of the automobile, 104MND. He then made contact with the Cambridge police, who broadcast this registration number over the police radio system.

At approximately 11:45 A.M., Perry was at or near Inman Square on Cambridge Street. He made a telephone call to his former wife, and they agreed to meet for brunch. About fifteen minutes later, Perry's former wife was driving along Cambridge Street toward Inman Square. When she reached the area of the hospital, she saw two paramedics leaning over Perry, who was lying on the street between two parked automobiles.

A witness, William Thomas, was watching television in his third-floor apartment at 66 Maple Avenue. Maple Avenue, a one-way street, begins at Cambridge Street, in front of the hospital, and runs south to Broadway. Number 66 is on the east side of Maple Avenue, three house lengths down from Cambridge Street. Hearing gunshots, Thomas went to the front windows of his apartment and looked up toward Cambridge Street. Thomas saw a man with a handgun running diagonally from the corner of Cambridge Street, down and

across to the east side of Maple Avenue. This man ran past Thomas's house and got into the passenger seat of an automobile parked in front of the house next door to Thomas's, one house length further from Cambridge Street. The automobile was parked on Maple Avenue where it was accessible to Cambridge Street and in position to be driven south down the one-way street. Thomas left the window to get paper and pencil to write down the registration number of the automobile, which he described as "off-white." When he returned to the window, the automobile was pulling out 'of its position and heading south. The registration number was 104MND.

Another witness, Thomas Scott, was with his children at a playground on the west side of Maple Avenue, one block down from Cambridge Street and about seventy-five yards away from a parked automobile. Scott also saw a man running from Cambridge Street, down and across Maple Avenue, to the passenger side of a parked automobile, which Scott described as "yellow." The driver then pulled away "immediately." When the automobile passed Scott, it was travelling at about forty-five miles per hour, and Scott saw Good peering out of the passenger side window.

Other witnesses testified that Good lived on Highland Park, a dead-end street running off of Highland Avenue, the next street to the west of Maple Avenue. Good could have reached his house on foot from Maple Avenue by going into the driveway of the second house down from the playground, through to the backyard, and then through a hole in the fence and onto his property.

As the defendant drove away from the scene, he disregarded a stop sign at the intersection of Dana and Harvard Streets, and struck another automobile, driven by Cheryl Bergeron, broadside. Just after the accident, Bergeron saw Good walking quickly down Dana Street towards Massachusetts Avenue. She also saw Good look over his shoulder and heard him say, " 'I'm getting out of here,' something of that nature." The defendant, described by a witness as "very heavy," made no effort to leave the scene of the accident and leaned against the fender of his automobile.

A Cambridge police officer, Kevin Davis, arrived at the accident scene and recognized the registration number on the defendant's automobile, 104MND, as the one that had been broadcast earlier that morning and again before noon. Officer Davis gave the defendant Miranda warnings immediately, and the defendant responded, "What's the big deal about an accident? I'm the only one." Either the defendant or a bystander later told Officer Davis that another person had been in the automobile. A brown paper bag containing six or seven bullets (similar to those used to kill Perry)[2] was found on the floor of the defendant's automobile by the passenger seat. There was also gunpowder residue on the inside upper portion of the passenger side door of the automobile.

In his case, the defendant offered one witness, his mother, who worked at Cambridge City Hospital. The judge excluded her testimony as inadmissible hearsay. We shall address the issue of the judge's ruling on this testimony later in the opinion.

1. *Motion for required finding.* At the conclusion of all the evidence, the defendant moved for a required finding of not guilty on the basis that the Commonwealth's evidence was insufficient to show that he knew of, and shared, Good's intention to kill or grievously injure Perry. See Mass. R. Crim. P. 25 (a), 378 Mass. 896 (1979). The judge denied the motion and submitted the case to the jury. The defendant argues that the motion should have been allowed.

"The essential question in evaluating the denial of a motion for a required finding of not guilty is whether the evidence received, viewed in a light most favorable to the Commonwealth, is sufficient so that the jury 'might properly draw inferences, not too remote in the ordinary course of events, or forbidden by any rule of law, and conclude upon all the established circumstances and warranted inferences that the guilt of the defendant was proved beyond a reasonable

---

[2]Perry was shot several times with .38 caliber bullets. Some of the bullets removed from the victim's body had a lead core and others had a copper jacket over a lead core. The paper bag contained .38 caliber bullets, some with a lead core and some with a copper jacket over a lead core.

doubt.' *Commonwealth* v. *Vellucci*, 284 Mass. 443, 445 (1933)." *Commonwealth* v. *Clary*, 388 Mass. 583, 588-589 (1983). A joint venturer, is "one who aids, commands, counsels, or encourages commission of a crime while sharing with the principal the mental state required for the crime." *Commonwealth* v. *Soares*, 377 Mass. 461, 470, cert. denied, 444 U.S. 881 (1979). "To be convicted of murder on a joint venture theory '[a] joint venturer need only intend that the victim be killed or know that there is a substantial likelihood of the victim's being killed.' *Commonwealth* v. *Podlaski*, 377 Mass. 339, 347 (1979)." *Commonwealth* v. *Champagne*, 399 Mass. 80, 86-87 (1987). "A person's knowledge or intent is a matter of fact, which is often not susceptible of proof by direct evidence, so resort is frequently made to proof by inference from all the facts and circumstances developed at the trial. . . . The inferences drawn by the jury need only be reasonable and possible and need not be necessary or inescapable . . . " (citations omitted). *Commonwealth* v. *Casale*, 381 Mass. 167, 173 (1980). "The line that separates mere knowledge of unlawful conduct and participation in it, is 'often vague and uncertain. It is within the province of the jury to determine from the evidence whether a particular defendant [has] crossed that line.' " *Commonwealth* v. *Cerveny*, 387 Mass. 280, 287 (1982), quoting *Commonwealth* v. *Beneficial Fin. Co.*, 360 Mass. 188, 250 (1971), cert. denied sub nom. *Farrell* v. *Massachusetts*, 407 U.S. 910, and *Beneficial Fin. Co.* v. *Massachusetts*, 407 U.S. 914 (1972). "To the extent that conflicting inferences are possible from the evidence, 'it is for the jury to determine where the truth lies.' " *Commonwealth* v. *Wilborne*, 382 Mass. 241, 245 (1981), quoting *Commonwealth* v. *Amazeen*, 375 Mass. 73, 81 (1978).

Applying these standards to this case, we conclude that the Commonwealth presented evidence sufficient to prove that the defendant had the requisite knowledge and intent. There was evidence that the defendant was seen with Good several times from 1 A.M. on September 27, until just before the murder, at about noon, and again immediately after the mur-

der. On each occasion, the defendant and Good were seen driving on Cambridge Street close to Perry's residence. There was evidence that, at about 8 A.M., Good shot and killed a cat from the passenger side window of the defendant's automobile while the defendant drove. There was evidence that, immediately after the murder, Good ran directly to, and entered, the defendant's automobile; that the automobile had been parked discreetly on a one-way side street near the scene of the murder where it would be accessible to Good; and that the automobile instantly pulled away from the curb at high speed without any apparent conversation between Good and the defendant. There was also evidence that the defendant lied to the police officer at the scene of the accident that occurred as Good and the defendant attempted to flee, telling the officer that no one else had been in the automobile with him.

From all the Commonwealth's evidence, the jury reasonably could have inferred that the defendant and Good had been driving up and down Cambridge Street over the course of several hours looking for Perry so Good could shoot him;[3] that in the vicinity of the Perry's home a cat was killed to test the gun, to target practice, or to pass the time during the "stake-out" for Perry; and that the defendant deliberately parked on a side street near Cambridge Street, and around the corner from where Perry was soon to pass, in order to facilitate a speedy escape after the murder. The jury could

---

[3]On the evidence presented in Good's separate trial, a jury might conceivably have inferred that Good did not plan long in advance to kill the victim at the exact time and place of the shooting. See *Commonwealth* v. *Good, supra,* at 618 n.5. Our observation to this effect was made in response to Good's argument on his appeal that evidence of premeditation was entirely lacking. We did not relate the observation to the context of the defendant's involvement in Good's crime over the long period of time the two men spent together. We concluded in Good's case that, at a minimum, the jury could have found that Good resolved to murder Perry no later than the time he approached him on the street. However, this was not the only reasonable inference in *Good,* nor is it in this case. In this case, we conclude that the evidence permitted the stronger inference that Good planned in advance to kill Perry, and that the defendant knew of this plan and intended to aid Good in committing the murder.

also have reasonably inferred that the defendant's intent to assist Good in this venture was further shown by evidence that Good ran directly to the defendant's automobile after the shooting; that, without any hesitation or conversation, the defendant immediately pulled away and sped up the street at a high rate of speed; and that the defendant subsequently covered Good's escape by lying to the police.

The defendant refers to *Commonwealth* v. *Mandile*, 403 Mass. 93 (1988), and *Commonwealth* v. *Walsh*, 407 Mass. 740 (1991) (decisions in which the Commonwealth's evidence that the defendant had participated in a murder as a joint venturer was found insufficient to overcome a motion for required finding of not guilty), and argues that these decisions control the outcome here. The Commonwealth's evidence in this case is stronger than the Commonwealth's evidence in either *Mandile* or *Walsh* for the reasons we now explain.

In *Mandile*, *supra* at 95, the defendant and the shooter pulled into the driveway of the victim's home. The shooter then entered the home alone, leaving the defendant waiting in his automobile for ten to fifteen minutes. *Id.* There was no evidence that the defendant pulled away immediately when the shooter returned to the automobile. *Id.* at 95, 101. We considered the lack of such evidence a serious weakness in the Commonwealth's case, *id.* at 101. We concluded, based on the absence of this evidence, the length of time the shooter remained in the victim's home, and other factors, that the evidence was not sufficient for the jury to infer that the defendant actually knew the shooter intended to kill the victim. In this case, the murder occurred quickly after Good spotted Perry, and there was evidence that Good ran to the defendant's automobile which had been parked nearby immediately after the murder. Moreover, there was evidence that the defendant instantly moved the automobile out of its parking space and accelerated rapidly without first conversing with Good. This sort of evidence, lacking in *Mandile*, was indicative of prearrangement between the defendant and Good, and tended to prove advance knowledge on the defend-

ant's part of what had just occurred on Cambridge Street. See *Commonwealth* v. *Giang*, 402 Mass. 604, 609 (1988).

In *Walsh, supra* at 741, the Commonwealth prosecuted the defendant as a joint venturer with another man. Two victims had been assaulted — the other man attacked one victim with a knife, while the defendant attacked the second victim with a bottle. *Id.* at 742. The victim attacked by the defendant's companion subsequently died of stab wounds, but the victim attacked by the defendant survived. *Id.* at 743. The defendant was convicted of several charges in connection with his attack, and, on a joint venture theory, was also convicted of the murder of the victim he did not attack. *Id.* at 740. We concluded that the Commonwealth's evidence was insufficient on several grounds. First, and most crucially, there was no evidence that the defendant knew prior to the attacks that his companion was armed. *Id.* In addition, there was no evidence that the two attacks were made in concert in any way. *Id.* at 745. Also, none of the evidence of consciousness of guilt presented in *Walsh* went specifically to the defendant's consciousness of guilt in the murder. All of that evidence was equally explainable as consciousness of guilt in the defendant's separate assault on the injured victim. *Id.* In this case, there was evidence that the defendant knew that Good was armed with a working handgun because the defendant had seen Good shoot the cat. Also in this case, there was only one attack, the fatal shooting of Perry. There was evidence, therefore, from which the jury could have found that Good and the defendant were acting in concert in carrying out a single deadly attack with a handgun. Further, in this case the defendant's lying to the police at the scene of the subsequent automobile accident could not have been designed to shield the defendant for his conduct in some other, independent event.

For these reasons, we find the decisions relied upon by the defendant inapposite. We conclude that the judge properly submitted the case against the defendant to the jury because experience and common sense permitted the jury to infer

from the evidence that the defendant was an active participant in the murder.

2. *Motion in limine.* The defendant filed a motion in limine to bar the testimony concerning the shooting of the cat. The defendant argued that the testimony was irrelevant, or that its marginal relevance was substantially outweighed by unfair prejudice. After a hearing, the judge denied the motion. The defendant objected to the evidence when it was introduced at trial. See *Commonwealth* v. *Gabbidon*, 398 Mass. 1, 7 (1986). The defendant now argues that the evidence of the cat shooting should have been excluded because it was (1) irrelevant and (2) unfairly prejudicial evidence of a prior bad act. We reject both contentions.

Whether evidence is relevant depends on its logical tendency to prove some issue in the case on trial. *Commonwealth* v. *Tobin*, 392 Mass. 604, 613 (1984). *Commonwealth* v. *Chretien*, 383 Mass. 123, 135 (1981). Evidence of a defendant's prior bad acts is inadmissible to prove guilt, but is admissible for other relevant probative purposes. *Commonwealth* v. *Cordle*, 404 Mass. 733, 744 (1989). *Commonwealth* v. *Weaver*, 400 Mass. 612, 619 (1987). *Commonwealth* v. *Chalifoux*, 362 Mass. 811, 815-816 (1973).

The evidence of the shooting of the cat was relevant. It was highly probative of the defendant's knowledge that Good was armed with a working handgun. This knowledge, in turn, had a rational tendency to prove that the defendant knew of Good's intent to kill Perry before the murder actually took place. The defendant's intent was the most strenuously contested issue at trial. In the circumstances, the evidence of the cat shooting clearly "provide[d] a link in the chain of proof" against him. *Commonwealth* v. *Gordon*, 407 Mass. 340, 351, (1990), quoting *Commonwealth* v. *Tobin*, *supra* at 613.

For similar reasons, the evidence was not unfairly prejudicial. While the evidence suggested that the defendant had participated in a cruel act, the judge reasonably concluded that the probative value of the evidence on an essential element of the Commonwealth's proof outweighed any prejudice. The judge properly admitted the evidence.

3. *Exclusion of testimony.* As has been noted, the defendant called his mother as a witness. The defendant's trial counsel asked the witness whether she had a telephone conversation with the defendant after 10 A.M. on the day of the murder. The prosecutor objected to the witness's being allowed to state the substance of the telephone conversation. The judge sustained the objection, ruling that the testimony constituted inadmissible hearsay. The defendant's trial counsel indicated that the witness would have testified, if permitted to do so, that the defendant had telephoned on the morning of the murder and had made arrangements to meet her at noon for lunch at Cambridge City Hospital where she worked. The judge refused to change his ruling that excluded the testimony.[4]

The defendant's trial counsel offered the judge no acceptable basis on which to allow the conversation in evidence. In support of his offer of proof, trial counsel stated only that the proposed evidence fell within "the classic case, the Hillmon case." The reference by counsel was to *Mutual Life Ins. Co. v. Hillmon,* 145 U.S. 285 (1892). In that decision, the United States Supreme Court stated that evidence that a person expressed an intention in the past to go somewhere and meet someone was admissible to prove that the person later actually did what he or she intended. *Id.* at 295-296. The testimony offered in this case does not fit the *Hillmon* rule because the defendant did not offer the evidence of his intention to meet his mother for lunch to prove the fact that he had lunch with her. See *Commonwealth* v. *Trefethen,* 157 Mass. 180, 185-186 (1892); *Cooke* v. *Moore,* 11 Cush. 213, 217 (1853). Rather, the defendant offered the evidence to prove his intention. Therefore, on what was argued to him at trial, the judge correctly rejected the offer of proof because

---

[4]The judge explained his ruling by stating that the defendant's statement constituted "an out of court statement made to prove the truth of the matter asserted. Namely that he was not planning [to] kill . . . anybody, but rather was going to have lunch with his mother." The judge concluded that "[m]y problem is [the mother's] plans are not relevant to the case and his statements are rank hearsay . . . ."

the testimony concerned an out-of-court statement which was offered to prove the truth of the matter contained in the statement, see P.J. Liacos, Massachusetts Evidence 265 (5th ed. 1981), and did not fall within the *Hillmon* rule.

On appeal, the defendant maintains that the testimony was not hearsay and refers to several decisions (none of which was given to the judge) to support a revised argument that the testimony was necessary to afford him a fair trial. The decisions now relied on by the defendant are not helpful to him. They involve such matters as in-court testimony by a defendant about his intent to commit the crime with which he is charged, see *Commonwealth* v. *Caldron*, 383 Mass. 86, 89-90 (1981); *Commonwealth* v. *Huffman*, 11 Mass. App. Ct. 185, 190, *S.C.*, 385 Mass. 122 (1982); statements of intent expressing background circumstantial facts not offered for their truth, see *Commonwealth* v. *Goulet*, 374 Mass. 404, 418 (1978); *Commonwealth* v. *Wampler*, 369 Mass. 121, 122-123 (1975); *Commonwealth* v. *Fiore*, 364 Mass. 819, 824 (1974); *Commonwealth* v. *Marcotte*, 18 Mass. App. Ct. 391, 396 (1984); statements involving the defendant's mental condition when his sanity was in issue, see *Commonwealth* v. *Louraine*, 390 Mass. 28, 34 (1983); and statements falling within the *Hillmon* rule described above, see *Commonwealth* v. *Ferreira*, 381 Mass. 306, 310-311 (1980). None of the bases for admitting the statements in these decisions is involved in this case. There is, therefore, still no showing by the defendant of a supportable reason for allowing the testimony. Furthermore, considering that the judge was not presented with the arguments now made about the evidence, there is no showing of any basis for concluding that its exclusion gives rise to a substantial risk of a miscarriage of justice. Finally, it follows from what has been said that, to the extent that the judge may have possessed discretion to admit the testimony, it has not been demonstrated that he abused that discretion.

4. *The prosecutor's closing argument.* The defendant argues that certain portions of the prosecutor's summation to the jury touched on matters not in evidence and were attempts to inflame the jury. The criticized remarks were not

objected to by the defendant's trial counsel. We therefore consider only whether the remarks of the prosecutor created a substantial risk of a miscarriage of justice. *Commonwealth* v. *Kozec*, 399 Mass. 514, 518 n.8 (1987).

a. The prosecutor referred to the incident of the cat shooting several times in his final argument. The references, by and large, concerned the drawing of fair and reasonable inferences from evidence that was properly admitted. The prosecutor's effort at the end of his summation to draw an analogy between the shooting of the cat and the shooting of the victim involved some hyperbole but nothing beyond the ability of the jury to discount. *Commonwealth* v. *Glass*, 401 Mass. 799, 806 (1988).

b. The prosecutor's argument directing the jury's attention to the fact that the Commonwealth's witnesses had not been shown to have any stake in the outcome of the case was, in context, an effort to focus the jury on a factor to consider in assessing the credibility of the witnesses. The argument also did not constitute improper vouching by the prosecutor for the credibility of the Commonwealth's witnesses. The argument did not suggest in any way that the prosecutor personally believed that the defendant was guilty or that the prosecutor knew something outside of the evidence that implied an opinion on witness veracity. The over-all thrust of the prosecutor's argument was to invite the jury to determine for themselves, as was their duty, the credibility of the witnesses. See *Commonwealth* v. *Nicholson*, 20 Mass. App. Ct. 9, 18 (1985).

c. The prosecutor's reference, early in his argument, that "[i]t's [a] joint venture, two people take part in a common enterprise, to wit: to rob, to kill Robert Perry," stated a consideration ("to rob") of which there was no evidence. The reference was improper. The absence of any objection by the defendant's trial counsel indicates that his counsel did not consider "the tone, manner, and substance" of the prosecutor's statement when it was made to be harmful. *Commonwealth* v. *Toro*, 395 Mass. 354, 360 (1985). In view of the complete lack of any evidence of robbery, and assuming

some measure of sophistication on the part of the jury to sort out claims that had been supported by proof from those that had not, see *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 746 (1990), we are not prepared to say that the isolated reference by the prosecutor fatally prejudiced the jury's impartial consideration of the evidence against the defendant.

d. The other portions of the prosecutor's final argument criticized on appeal concerned comments that the Commonwealth did not have to prove a long-standing plan between the defendant and Good to murder Perry to obtain a conviction and the location of the defendant's automobile on Cambridge Street in a good spot to effect a quick getaway. Both portions of the argument were proper. The first point was a proper comment on the Commonwealth's burden of proof which responded to a statement made by the defendant's trial counsel in his closing argument that could have been misconstrued. The second point argued permissible inferences from the evidence.

5. *Jury instructions.* The defendant's trial counsel objected to the judge's instructions on joint venture. Trial counsel stated that the instructions had not "adequately said [that the defendant's] knowledge and intent [to participate in the crime] must exist prior to the shooting." On appeal, while admitting that the judge's instructions on joint venture "mirrored the case law," the defendant continues to argue that the instructions failed completely to inform the jury that they had to be satisfied in order to return a guilty verdict that the defendant knew before the shooting what Good was going to do, and that he shared with Good the mental state necessary for the crime. We conclude that the instructions accurately stated the law, and properly informed the jury of the mental state that the defendant had to have formed before the killing.

The judge told the jury the defendant was charged with murder as a joint venturer with Good and that the Commonwealth had to prove such an association beyond a reasonable doubt. The jury were instructed that the Commonwealth must establish that the defendant associated himself with a

criminal venture and participated to some extent in the commission of the crime. *Commonwealth* v. *Chinn*, 6 Mass. App. Ct. 714, 716-717 (1978). The judge told the jury that mere presence at a crime scene was not enough, that failure to prevent commission of the crime was insufficient, and that a mere agreement to commit the crime could not prove joint venture liability. *Commonwealth* v. *Casale*, 381 Mass. 167, 173 (1980). *Commonwealth* v. *Saez*, 21 Mass. App. Ct. 408, 410-411 (1986).

The judge described the requirements of proof of joint venture by tracking the language of *Commonwealth* v. *Soares*, 377 Mass. 461, 470 (1979), and *Commonwealth* v. *Chinn*, *supra* at 716, stating that the evidence must show that "[the defendant], counselled, hired, or otherwise procured the actual perpetrator, rendered aid to the perpetrator, assistance or encouragement to the perpetrator, or put himself in a position ready to render aid in the commission of the crime." Importantly, the judge stressed the following:

> "A defendant's guilt under a joint venture theory is established when it is shown beyond a reasonable doubt that he, meaning Mr. Stewart, intentionally assisted the actual perpetrator in the commission of a crime and that he did this while sharing the mental state required for the crime. I'm going to repeat that because that's going to be important in respect to instructions I'm going to give you about murder in the first degree, the elements of murder in the first degree. I want to repeat that. The defendant's guilt is established when it is shown beyond a reasonable doubt that he intentionally assisted the actual perpetrator in the commission of the crime and that he did this while sharing the mental state required for that crime, the same specific intent that the perpetrator had."

See *Commonwealth* v. *Casale*, *supra* at 173; *Commonwealth* v. *Soares*, *supra* at 470; *Commonwealth* v. *Saez*, *supra* at 410. This instruction directed the jurors to determine

whether the defendant had the mental state required for the crime of murder in the first degree, that is, deliberately premeditated malice aforethought.

These instructions on joint venture were accompanied by clear and correct instructions on the elements of murder in the first degree and second degree, including the elements of premeditation and the various types of malice. The matter was summed up by a direct instruction that the Commonwealth was required to show "beyond a reasonable doubt that [the defendant] intentionally assisted Good and that he did this while sharing the mental state required for that crime [i.e., murder]. In other words, that he shared this state of deliberate premeditation."

We are satisfied that the jury instructions on joint venture and murder, considered as a whole, adequately advised the jury that, to find the defendant guilty as a joint venturer with Good, they must find that the defendant possessed the requisite state of mind prior to, and at the time of, Perry's murder, and that he acted in keeping with that intention to assist in the crime.

*Judgment affirmed.*