COMMONWEALTH *vs.* GARY STEWART.

No. 89-P-223.

Middlesex. November 13, 1990. - May 14, 1991.

Present: PERRETTA, KASS, & JACOBS, JJ.

Further appellate review granted, 410 Mass. 1103 (1991).

*Homicide. Joint Enterprise. Evidence,* State of mind, Consciousness of guilt. *Practice, Criminal,* Required finding.

At the trial of an indictment for murder, in which the prosecution proceeded on the theory that the defendant was a joint venturer as the driver of the car in which a second person fled after premeditatedly murdering the victim, there was insufficient evidence to show beyond a reasonable doubt that the defendant knew of and shared in the murderer's intent to kill or to inflict grievous bodily harm. [573-577] KASS, J., dissenting.

INDICTMENT found and returned in the Superior Court Department on August 1, 1986.

The case was tried before *Guy Volterra,* J.

*Patricia A. O'Neill,* Committee for Public Counsel Services, for the defendant.

*David R. Marks,* Assistant District Attorney, for the Commonwealth.

PERRETTA, J. This is an appeal from a conviction of murder in the second degree by the driver of the car in which John Good fled after his premeditated murder of Robert Perry. See *Commonwealth* v. *Good,* 409 Mass. 612 (1991). The Commonwealth proceeded against the defendant, who was tried separately from Good, on the basis of joint venture liability. The defendant's primary contention on appeal is that there was insufficient evidence to show beyond a reasonable doubt that he intended Perry's death or that he had any knowledge of a substantial likelihood that Good intended to kill or to inflict grievous bodily harm upon Perry. We con-

clude that the Commonwealth failed to sustain its burden of proof and reverse the conviction.

1. *Background.*

It appears from the opinion in *Good* that much of the evidence presented against him was also introduced at the defendant's trial. By way of background, we simply repeat the circumstances of the murder as set out in *Good, supra* at 613: "About noon on July 27, 1986, the victim, Robert Perry, was walking along Cambridge Street in Cambridge, near its intersection with Maple Avenue, when he was shot three times. A thin white man carrying a handgun ran from the location of the victim's body to a Pontiac automobile bearing Massachusetts registration plate number 104 MND. The Pontiac sped away down Maple Avenue. At a nearby intersection, the driver of the Pontiac disregarded a stop sign and collided with another car. The front seat passenger in the Pontiac (a thin white man) then left the car and walked briskly away. None of the witnesses testifying to these facts actually observed the shooting of the victim."

2. *The Evidence of Joint Venture.*[1]

There was evidence to show that at about 1:00 A.M., July 27, 1986, the defendant, Good, and a third man were together at the Night and Day Bar on Tremont and Cambridge Streets, about four blocks east of the Cambridge City Hospital and seven west of Hunting Street.[2] Some seven hours later, at 7:50 A.M., the defendant, Good, and another man were seen in a yellow or off-white car, Massachusetts registration number 104 MND, driving west on Cambridge Street near Hunting Street. The defendant was driving, Good was in the front passenger seat, and the third person was in the back.

As they drove along, slowly, they passed a green car parked at the curb. A white cat was asleep on top of the car. The defendant made a U-turn on Cambridge Street, and, now driving east, pulled abreast the parked car. Good

---

[1] As charged, the joint venture was to kill. This case presents no felony-murder theory of guilt.

[2] Perry lived on or near Hunting Street.

pointed a gun out his window and shot the cat in the neck twice, killing it. A witness heard and saw the three men laugh as Good pulled his gun back into the car, and the defendant drove off. This witness saw the registration number of the car, 104 MND, which was then broadcast over the Cambridge police radio system.

About 11:45 A.M., Perry was at or near Inman Square on Cambridge Street. He made a telephone call to his former wife, Sandra Cross, and they agreed to meet for brunch. Cross lived about four blocks west of the hospital, near the Cambridge Rindge and Latin High School. She was going to pick him up as he walked along Cambridge Street. About fifteen minutes later, Cross was driving along Cambridge Street towards Inman Square. When she reached the area of the hospital, she saw two paramedics leaning over Perry, who was lying on the street between two parked cars.

William Thomas was watching television in his third-floor apartment at 66 Maple Avenue. Maple Avenue begins at Cambridge Street, in front of the hospital, and runs one-way, south to Broadway. Number 66 is on the east side of Maple Avenue, three house lengths down from Cambridge Street.[3] Hearing gunshots, Thomas went to his front windows and looked up toward Cambridge Street. He saw a man with a gun in his hand running diagonally from the corner of Cambridge Street, down and across to the east side of Maple Avenue. The man ran past Thomas' house and got into the passenger seat of a car parked in front of the house next down from his.

Thomas left the window to get paper and pencil so that he could write down the registration number of the car, which he described as "off-white." When he returned to the window, the car was pulling out of its position to drive south. The registration number was 104 MND.

Another witness, Thomas Scott, was with his children in a playground, a "tot-lot" on the west side of Maple Avenue,

---

[3]Although three house-lengths down from Cambridge Street, number 66 is not the third house. Rather, there is a laundry on the corner and then a parking lot.

one block down from Cambridge Street and about seventy-five yards away from the parked car in question. Scott also saw a man running from Cambridge Street, down and across Maple Avenue, to the passenger side of the parked car. The driver then pulled out "immediately." When the car, which Scott described as yellow, passed him, it was travelling at about forty-five miles an hour.

There was also testimony to show that Good lived on Highland Park, a dead-end street running off of Highland Avenue, the next street to the west of Maple Avenue. Good could have reached his house, by foot, from Maple Avenue by going into the driveway of the second house down from the "tot-lot," through to the backyard, and then through a hole in the fence and onto his property. In any event, there was evidence to show that Good was the defendant's passenger.

Cheryl Bergeron was driving along Harvard Street about noontime when her car was hit broadside by a car that went through the stop sign at the intersection of Dana and Harvard Streets. Bergeron saw a man, Good, walking quickly down Dana Street toward Massachusetts Avenue. He looked back over his shoulder and said, "I'm getting out of here," or words to that effect. The defendant, described by another witness as "very heavy," made no effort to flee. He was leaning against the fender of his car.

Cambridge police officer Kevin Davis arrived at the accident scene and recognized the defendant's registration number, 104 MND, as one that had been broadcast earlier that morning and again before noontime. Davis gave the defendant Miranda warnings immediately, and the defendant responded, "What's the big deal? This is only an accident. I'm the only one." There appears to be some confusion, perhaps conflict, as to whether the defendant told Davis, "My buddy's with me" or whether an onlooker told Davis that there had been another person in the car.

There was a brown bag containing six or seven bullets (similar to those used to kill Perry) on the floor of the car by

the passenger seat. There was also gunshot residue on the inside upper portion of the passenger side door.

After the Commonwealth rested, the defendant moved for a required finding of not guilty. The motion was denied, and the defendant presented one witness, his mother, who worked at the hospital. The judge ruled her testimony, that the defendant called her at 10:00 A.M. and arranged to meet her at the hospital at noon for lunch, was inadmissible hearsay. The defendant renewed his motion which was, again, denied.

3. *Discussion.*

"The question here is whether there was sufficient evidence from which the jury could infer that the 'defendant was (1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement is willing and available to help the other if necessary.' *Commonwealth* v. *Bianco*, 388 Mass. 358, 366, *S.C.*, 390 Mass. 254 (1983). *Commonwealth* v. *Casale*, 381 Mass. 167, 173 (1980). *Commonwealth* v. *Soares*, 377 Mass. 461, 470, cert. denied, 444 U.S. 881 (1979). In the context of a charge of murder, a specific intent crime, the prosecution must prove that the defendant '[shared] with the principal the mental state required for the crime.' *Id.*" *Commonwealth* v. *Mandile*, 403 Mass. 93, 99-100 (1988).

There is sufficient evidence to support the following inferences: the defendant knew Good, the defendant was the driver of the car from which Good shot the cat at 7:50 A.M., the defendant knew that Good, at about the time of Perry's murder, had a gun in his possession, the defendant was the driver of the car in which Good fled after the murder, and the defendant knew (as could be inferred from his statement at the scene of the intersection accident) that Good had committed a crime. To these inferences we add another, as most recently found reasonable in *Commonwealth* v. *Good*, 409 Mass. at 618, that Good, "armed with a handgun, left a parked car, approached the victim, . . . and shot him. . . ." We will assume the "parked car" to be the car on Maple Avenue.

As can be seen from the recited evidence and reasonable inferences, there is a gap in the direct proof on the issues of the defendant's knowledge of Good's intent and whether he shared that specific intent. The Commonwealth argues (and the dissent agrees) that the evidence was sufficient to allow the jury also to infer: "[T]he defendant and Good had been driving up and down Cambridge Street over the course of several hours with the intent to murder Robert Perry, that in the vicinity of the victim's home a cat was killed to test the gun, to target practice, or to pass the time during the 'stakeout' for the victim, and that the defendant deliberately parked facing away from Cambridge Street and around the corner from where the victim was soon to pass in order to facilitate a speedy escape after the murder. The defendant's intent to assist John Good in this venture is further shown by the evidence that Good ran directly to the car after the shooting, that, without any hesitation or conversation, the defendant immediately pulled away and sped up the street, and that the defendant subsequently further facilitated the principal's escape by lying to the police."

Evidence was not offered to show that either the defendant or Good knew Perry, knew where he lived, or that he would be in the area of Cambridge Street and Maple Avenue. Compare *Commonwealth* v. *Mandile*, 403 Mass. at 96. And, although the killing of the cat "suggested that [Good] used a gun in a cruel, reckless, and perhaps criminal fashion," *Commonwealth* v. *Good*, 409 Mass. at 622, the Commonwealth offers three possible reasons for that act: (1) "to test the gun"; (2) "to target practice"; or (3) "to pass the time during the 'stake-out' for the victim." Each of these reasons, however, is based upon the *assumptions* that Good and the defendant, at that time (7:50 A.M.), had formulated the intent to harm Perry who they knew lived in the vicinity.

In concluding that to rely upon any of the suggested inferences would be to engage in conjecture, we again turn to *Commonwealth* v. *Good*, 409 Mass. at 618. There the Court, in holding that the evidence was sufficient to show that Good "at least briefly reflected on his resolution to kill the victim,"

began its analysis at the point Good "left a parked car." Although premeditation can be established by evidence of brief reflection, *id.* at 617, and it was, therefore, unnecessary in disposing of Good's claim to look back to 7:50 A.M. and deal with a four-hour gap in the evidence, we think the court's observation at 409 Mass. 618 n.5 is here pertinent: "[Good's] argument that there was no evidence that the shooting was other than an unplanned 'happenstance' is beside the point. *It may well be (as one could infer from the evidence at trial) that [Good] did not plan in advance to kill the victim at the exact time and place of the shooting.* Nevertheless, there was sufficient evidence from which a rational trier of fact could conclude that, as he approached the victim, [Good] resolved to kill him." (Emphasis supplied.)

If, on identical evidence, it would be reasonable for Good's jury to infer that he did "not plan in advance to kill the victim at the exact time and place of the shooting," it follows that it would be reasonable for the defendant's jury to make the same inference. And, to argue that the opposite inference, an advance plan, is equally available, gains the Commonwealth nothing in meeting its burden of proof. " 'When the evidence tends equally to sustain either of two inconsistent propositions, neither of them can be said to have been established by legitimate proof.' *Commonwealth* v. *O'Brien,* 305 Mass. 393, 400 (1940). This is because '[i]n choosing among the possible inferences from the evidence presented, a jury necessarily would have to employ conjecture. This is insufficient to sustain the burden resting upon the Commonwealth.' *Commonwealth* v. *Croft,* 345 Mass. 143, 145 (1962). See *Commonwealth* v. *Senati,* 3 Mass. App. Ct. 304, 306 (1975)." *Commonwealth* v. *Wooden,* 13 Mass. App. Ct. 417, 424 (1982).

We come, then, to that place where the direct evidence leads us, on Maple Avenue, three house lengths and a street width away from the hospital. There is no evidence of the time of the defendant's arrival, other than sometime between 8:00 A.M. and shortly before noon. It would be reasonable for the jury to infer that Good, armed with a handgun, left the

car. See *Commonwealth* v. *Good*, 409 Mass. at 618. We, as with the dissent, think it unlikely that the defendant thought that Good was off to "buy the Sunday paper." But, suspicion of some criminal act aside, the Commonwealth must produce affirmative evidence to show beyond a reasonable doubt that the defendant knew that Good was off to kill or to inflict grievous bodily harm.

All the circumstances must be considered. From the evidence that the witnesses on Maple Avenue heard the shots, it can be inferred that the defendant did. Good ran back to the car. Upon Good's return to the car, the defendant "immediately" pulled the car from its space and sped down Maple Avenue.

The Commonwealth places emphasis on the fact that the defendant drove off "without any hesitation or conversation." Although it might be reasonable to infer knowledge where a joint venturer instantly drives away without communicating with the principal, see *Commonwealth* v. *Mandile*, 403 Mass. at 101, there is no evidence before us as to whether Good and the defendant did or did not communicate with each other. The inference urged by the Commonwealth is premised upon an absence of proof rather than evidence and is, therefore, conjecture.

Even assuming, however, that there was no conversation between the two, we do not think that assumed fact probative, on all the evidence, of whether the defendant knew of and shared Good's intent to kill or to inflict grievous bodily harm. Compare *Commonwealth* v. *Giang*, 402 Mass. 604, 609-610 (1988), where the facts and circumstances, including a conference between the principal and the defendant-driver moments before the robbery, were sufficient to permit the jury to infer the defendant's requisite mental state as a joint venturer.

To be sure, there was evidence of a consciousness of guilt. But as to what (the "cruel, reckless, and perhaps criminal" shooting of the cat, *Commonwealth* v. *Good*, 409 Mass. at 622, the planned harm or death of Perry, or the after-the-fact assistance to Good), we are left to speculate. As the

judge correctly instructed in *Commonwealth* v. *Stewart*, 398 Mass. 535, 549 (1986), " 'the consciousness of guilt, if it exists, must be consciousness of guilt for having committed the crime that is charged.' " See also *Commonwealth* v. *Mandile*, 403 Mass. at 102.

Under the standard of review set out in *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-678 (1979), we conclude that the "jury could only have speculated that the defendant either knew that [Good] intended to kill or seriously harm [Perry] or knew of a substantial likelihood of such an attack." *Commonwealth* v. *Walsh*, 407 Mass. 740, 743 (1990). See also *Commonwealth* v. *Mandile*, 403 Mass. at 99-102.

4. *Conclusion.*

*Commonwealth* v. *Good*, 409 Mass. at 622, disposes of the defendant's contention concerning the prejudicial effect of the evidence of his involvement in the shooting of the cat, which we, in any event, need not reach. Our conclusion makes it unnecessary for us to consider whether the judge's ruling excluding the testimony of the defendant's mother[4] and the instructions concerning joint venture require reversal of the conviction.

The judgment is reversed, the verdict is set aside, and judgment is to be entered for the defendant.

*So ordered.*

---

[4]The Commonwealth argues that the mother's testimony was correctly excluded as it was irrelevant inadmissible hearsay. Had we accepted as reasonable those inferences urged by the Commonwealth, we think it likely that we also would have concluded that the mother's testimony was admissible hearsay critical to the defendant. See *Commonwealth* v. *Marcotte*, 18 Mass. App. Ct. 391, 396 (1984); Liacos, Massachusetts Evidence 262-265 (5th ed. 1981). At the least, it would have allowed the jury, who had the benefit of a view, to consider why the defendant was parked on Maple Avenue, at noon, a short distance from the hospital, and to infer that Good had been dropped off near his house as a matter of convenience and ran back to the car because he knew that the defendant would be there waiting for his mother. We suggest that these inferences, perhaps remote, are just as reasonable as the conflicting inferences advanced by the Commonwealth.

KASS, J. (dissenting). *Commonwealth* v. *Mandile*, 403 Mass. 93, 99-102 (1988), and *Commonwealth* v. *Walsh*, 407 Mass. 740, 743-745 (1990), indeed, require that before a defendant may be convicted as a joint venturer in murder, the government must present evidence which bears pointedly on a shared intent by the defendant to have the victim attacked in a manner likely to result in death. I think that such an inference is not only permissible, but compelling, on the facts of this case.

Here we have evidence that the defendant participated in a cruel form of target practice in the morning hours of the day of the murder, i.e., the shooting of the cat. There is no difficulty attributing to the defendant knowledge that his friend, John Good, is armed with a weapon that works. Compare *Commonwealth* v. *Walsh*, 407 Mass. at 745. One may infer that Good is testing the weapon and his marksmanship or that the pair enjoy shooting and killing. The next relevant fact of which there is evidence is that the defendant parks on a side street the car in which the pair have been cruising. The parking place is three house lengths or so from the intersection of that street, Maple Avenue, with Cambridge Street. The passenger leaves and the defendant stays with the car. For what purpose does the defendant tuck the car away discretely on a side street while his armed friend, Good, marches off? So that Good may buy the Sunday paper?

Then there are shots. Good gallops back to the car (not to his nearby residence) and the defendant *instantly* (compare *Commonwealth* v. *Mandile*, 403 Mass. at 101) drives off at a very high rate of speed. It is possible the defendant made a sprint start intuitively or because of something Good may have said as he rushed back to the car, but surely the jury could infer from the instantaneous quality of the defendant's departure that he needed no briefing upon Good's return — because he knew what Good's errand had been. So desperately does the defendant then maneuver the vehicle through the neighborhood streets that he barges into another car at an intersection. In response to inquiry he displays consciousness of guilt by saying he has been alone.

From those facts, I think a jury could infer that the defendant had knowledge of the specific intent of Good to shoot someone and that the defendant made himself available to assist Good in getting away from the scene of the crime. See *Commonwealth* v. *Giang*, 402 Mass. 604, 608-610 (1988).

Concerning exclusion of the proffer of testimony by the defendant's mother that he had called her at 10:00 A.M. to arrange to pick her up at noon, that exclusion is supportable on grounds of too marginal relevance. What the defendant's plans might have been at 10:00 A.M. have exceedingly little bearing on his homicidal intent at 11:45 A.M. The offer of proof said the mother, who had testified that she worked at Cambridge City Hospital, would further testify that the defendant had proposed picking her up at noon for lunch. As the noon hour approached, however, the defendant did not drive to Cambridge City Hospital but slipped into a parking place on Maple Avenue — and waited. I would affirm the judgment.