**Gary STEWART, Petitioner,**

v.

**William COALTER, Respondent.**

**Civ. A. No. 92–12660–DPW.**

United States District Court,
D. Massachusetts.

June 6, 1994.

As Corrected June 7, 1994.

---

Patricia A. O'Neill, Committee for Public Counsel Services, Boston, MA, for petitioner.

William J. Meade, Asst. Atty. Gen., Crim. Bureau, Boston, MA, for respondent.

## MEMORANDUM AND ORDER

WOODLOCK, District Judge.

■ This is a petition for a writ of habeas corpus brought by Gary Stewart, who was

convicted on March 14, 1987 of second degree murder as a joint venturer in the death of Robert Perry. Stewart was sentenced to life imprisonment in the Massachusetts Correctional Facility at Cedar Junction. A divided panel of the Massachusetts Appeals Court reversed the conviction for lack of sufficient evidence. *Commonwealth v. Stewart*, 30 Mass.App.Ct. 569, 571 N.E.2d 43 (1991). The Massachusetts Supreme Judicial Court rejected the Appeals Court determination and affirmed the conviction, finding the evidence sufficient. *Commonwealth v. Stewart*, 411 Mass. 345, 582 N.E.2d 514 (1991). Petitioner now seeks a writ of habeas corpus in federal court on grounds of evidentiary insufficiency. I will grant the petition because only by an inappropriate exercise of imaginative speculation can the evidence be said to support a finding that Stewart had the necessary intent to be convicted of second-degree murder.

## I.

Robert Perry was shot to death on Sunday, July 27, 1986 at approximately 11:45 A.M. on Cambridge Street in Cambridge. At trial, the Commonwealth sought to connect Stewart to the murder by tracing his whereabouts and association with the principal in the murder, John Good,[1] during the eleven hours preceding the shooting. The evidence at trial, essentially as reported by the two state appellate tribunals, was as follows:

Some time after 1:00 A.M. on July 27, 1986, policeman Edward Quinton saw Stewart enter the Night and Day bar at 1176 Cambridge Street with John Good and a third man, Dennis Clinton.[2] Quinton did not observe Stewart leave the bar.

Nearly seven hours later, at 7:50 A.M., the night security guard at the Harrington School was leaving the school when he saw a heavy set man driving a car bearing Massachusetts license plate numbered 104MND. A "skinny guy" was in the front passenger seat and another heavy set man was in the back seat. The car was headed west on Cambridge Street until it made a U-turn and pulled along side a parked green car which it had just passed. As the car carrying the three men reached the green car, the passenger pointed a handgun out the window on his side, shot twice and killed a cat sitting on the top of the car. The witness heard the three men laugh as the car drove off. He called the police and gave them the license plate number.

At 11:45 A.M., the victim, Robert Perry, who lived on a side street off Cambridge Street near the Harrington School, was walking west on Cambridge Street near Inman Square. He telephoned his ex-wife who agreed to meet him[3] as he walked west and she drove east on Cambridge Street. When she reached the vicinity of Cambridge City Hospital she saw paramedics leaning over a body which she identified as that of Perry, who had been shot and died of multiple gun shot wounds. Perry's body was found between two parked cars next to the curb west of the intersection of Cambridge Street and Maple Avenue.

After hearing gunshots at approximately noon, two witnesses on Maple Avenue, a street running to the south off Cambridge Street, saw Good, gun in hand, run from Cambridge Street diagonally across from the west to the east side of Maple Avenue where he jumped into a parked car. Neither witness could identify the person in the driver's seat of the parked car.[4]

---

1. Good was convicted of first degree murder in a separate trial and his conviction was affirmed on appeal. *Commonwealth v. Good*, 409 Mass. 612, 568 N.E.2d 1127 (1991).

2. Although the SJC opinion states "the defendant, Good, and a third *unidentified* man were together at [the] bar," *Commonwealth v. Stewart*, 411 Mass. 345, 346, 582 N.E.2d 514 (1991) (emphasis supplied), the trial transcript in the brief and only testimony—that of Officer Quinton—regarding their presence explicitly identifies Dennis Clinton as the third man.

3. This was their second conversation of the day. At 10:45 A.M., Perry had called her to ask her to take him to church. She refused because it was too late.

4. The jury observed the general area of the Cambridge Street–Maple Avenue location during a view taken on the first day of trial. Recognizing that "knowledge derived from an inspection of the scene may be characterized as evidence," *Snyder v. Massachusetts*, 291 U.S. 97, 113, 54 S.Ct. 330, 335, 78 L.Ed. 674 (1934), I arranged,

The first witness, William Thomas, saw the events as he was looking out his third-floor apartment window at 66 Maple Avenue. The apartment is located on the east side of Maple Avenue, the third lot south from Cambridge Street. After Thomas saw Good run to the car, which was parked in front of the next house on Maple Avenue to the south of his house, Thomas momentarily left the window to find paper and pencil with which to write the car's registration number. He returned as the car was pulling out of the space and saw the number, 104MND.

The second witness, Thomas Scott, was with his children at a playground on the west side of Maple Avenue, a full block south of Cambridge Street. When he heard the shots, Scott went to the fence of the playground. He saw Good run to the parked car and jump in. The car then took off immediately and sped down the street at approximately 45 miles per hour.

Moments later, Stewart was observed driving through a stop sign at the intersection of Dana and Harvard Streets striking an automobile driven by Cheryl Berrgeron and occupied by three other individuals. Berrgeron and another occupant saw Good walk away from the accident toward Massachusetts Avenue. She testified she heard Good say " 'I'm getting out of here' something of that nature." Stewart, a heavy set man, remained at the scene.

When the police arrived, they observed that the license plate of Stewart's car matched the one that had been broadcast earlier in the morning in connection with the cat shooting. Stewart produced his registration for the car. Officers Kevin Davis and James Hite gave Stewart his *Miranda* warnings. Stewart responded with essentially the words, "What's the big deal about an accident? I'm the only one." The police found a bag of bullets on the floor of the car on the passenger side.[5] The bullets were like those used to kill Perry. The police also found gunshot residue on the passenger side door of the car.

## II.

When examining a petition for a writ of habeas corpus challenging the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, *reh'g denied,* 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979) (emphasis in original); *see also Ortiz v. Dubois,* 19 F.3d 708, 717 (1st Cir.1994). The review of such a petition must be conducted "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson,* 443 U.S. at 324, n. 16, 99 S.Ct. at 2792, n. 16. *See also Ortiz,* 19 F.3d at 717 ("standard must be applied 'with specific reference to

after considering and rejecting the reservations expressed by both parties, a view to become familiar with all the evidentiary materials to which the jury had been exposed. In setting up this view, I did not seek to do any independent fact finding but rather to understand what evidence the jury could have relied upon. It was apparent that the jury could have found on the basis of the view that the intersection of Cambridge Street and Maple Avenue would be visible to Stewart, whom they could infer from all the evidence was the driver of the car parked on Maple Avenue. It was not argued to the jury that the location of Perry's body, after the shooting, further west along Cambridge Street was visible to Stewart from his car or that Stewart actually saw the shooting itself. Nevertheless, in order to familiarize myself fully with what the jury could have observed—and because a tree on Cambridge Street visible in photographs taken the day of the shooting had since been removed—I directed the development of evidence from which the state of the Cambridge Street sidewalk near where Perry's body was found could be reconstructed to understand its appearance at the time of the jurors' view. The Affidavit of Cambridge City Arborist, Jack Kelly, submitted to me after the view, when taken together with photographic exhibits introduced at trial, *see, e.g.,* Exhibits 21, 24 and 26, establish that Perry's body was located about 40 feet west of the intersection of Cambridge Street and Maple Avenue. After viewing the evidence in the light most favorable to the Commonwealth, I conclude that no reasonable juror could have found that the location where Perry's body came to rest would have been visible to Stewart from his car.

5. The police subsequently lost a box containing the articles, including the bullets, found in the car and thus the bullets themselves were not introduced into evidence at trial.

the elements of the offense as defined by state law'") (quoting *Campbell v. Fair,* 838 F.2d 1, 4 (1st Cir.), *cert. denied,* 488 U.S. 847, 109 S.Ct. 126, 102 L.Ed.2d 100 (1988)). Accordingly, I turn to the elements of the offense for which Stewart was convicted.

■ In Massachusetts, a joint venturer is "'one who aids, commands, counsels, or encourages commission of a crime while sharing with the principal the mental state required for the crime.'" *Commonwealth v. Daughtry,* 417 Mass. 136, 138, 627 N.E.2d 928 (1994) (quoting *Commonwealth v. Soares,* 377 Mass. 461, 470, 387 N.E.2d 499, *cert. denied,* 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 110 (1979)); *see generally,* M.G.L. ch. 274, § 2. The SJC has repeatedly stated that "'[t]he test [for joint venture] is whether [the] defendant was (1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement is willing and available to help the other if necessary." *Commonwealth v. Costa,* 407 Mass. 216, 224, 552 N.E.2d 106 (1990) (quoting *Commonwealth v. Longo,* 402 Mass. 482, 486, 524 N.E.2d 67 (1988)); *Commonwealth v. Noble,* 417 Mass. 341, 343 n. 1, 629 N.E.2d 1328 (1994); *Commonwealth v. Giang,* 402 Mass. 604, 608, 524 N.E.2d 383 (1988).

■ "Murder in the second degree is an unlawful killing with malice aforethought; malice includes any intent to inflict injury on another without legal excuse or palliation." *Commonwealth v. Casale,* 381 Mass. 167, 171–72, 408 N.E.2d 841 (1980). Malice can be shown either by proof that the defendant intended to kill or to do the victim grievous bodily harm or can be inferred "if, in the circumstances known to the defendant, a reasonably prudent person would have known that according to common experience there was a plain and strong likelihood that death would follow the contemplated act." *Commonwealth v. Grey,* 399 Mass. 469, 470, n. 1, 505 N.E.2d 171 (1987).

■ Joining the requirements of proof for a joint venture and for murder, Massachusetts law requires the Commonwealth to prove that an aider or abettor in a murder shared the principal's intent to murder. This element of the case will be satisfied if the joint venturer "'intend[ed] that the victim be killed or kn[e]w that there [wa]s a substantial likelihood of the victim's being killed.'" *Commonwealth v. Champagne,* 399 Mass. 80, 86–87, 503 N.E.2d 7 (1987) (quoting *Commonwealth v. Podlaski,* 377 Mass. 339, 347, 385 N.E.2d 1379 (1979)).

As the Supreme Judicial Court recently observed with reference to venerable precedent, a person "is a joint venturer even if not participating in the actual perpetration of the crime if, by agreement, he is positioned to render aid, '[f]or the presence of the abettor under such circumstances, must encourage and embolden the perpetrator to do the deed, by giving him hopes of immediate assistance.'" *Commonwealth v. Daughtry,* 417 Mass. at 138, 627 N.E.2d 928 (quoting *Commonwealth v. Soares,* 377 Mass. at 472, 387 N.E.2d 499 (quoting *Commonwealth v. Knapp,* 9 Pick. 495, 518 (1830))).

The central question in this petition, thus, is whether there was sufficient evidence for any rational juror to find beyond a reasonable doubt that petitioner shared Good's intent to kill Perry. The SJC has noted that "[a] person's knowledge or intent is a matter of fact, which is often not susceptible of proof by direct evidence, so resort is frequently made to proof by inference from all the facts and circumstances developed at the trial. . . . The inferences drawn by the jury need only be reasonable and possible and need not be necessary or inescapable . . ." *Commonwealth v. Casale,* 381 Mass. 167, 173, 408 N.E.2d 841 (1980); *see also Commonwealth v. Wilborne,* 382 Mass. 241, 245, 415 N.E.2d 192 (1981) ("To the extent that conflicting inferences are possible from the evidence, 'it is for the jury to determine where the truth lies'").

■ It is also well-established, however, that the evidence is insufficient where "an essential element of the crime [is left] entirely to conjecture or surmise." *Commonwealth v. Latimore,* 378 Mass. 671, 678, 393 N.E.2d 370 (1979); *Commonwealth v. Ancillo,* 350 Mass. 427, 432–33, 214 N.E.2d 870 (1966); *Commonwealth v. Fancy,* 349 Mass. 196, 200, 207 N.E.2d 276 (1965). And in this connection, "'[w]hether an inference is war-

ranted or impermissibly remote must be determined, not by hard and fast rules of law, but by experience and common sense'". *Commonwealth v. Giang,* 402 Mass. 604, 609, 524 N.E.2d 383 (1988) (quoting *Commonwealth v. Drew,* 4 Mass.App.Ct. 30, 32–33, 340 N.E.2d 524 (1976)).

### III.

■ I find that several inferences reasonably can be drawn from the evidence presented at Stewart's trial [6] viewing the evidence in the light most favorable to the prosecution. The jury could have inferred: a) that Stewart was the driver of the car from which Good shot the cat at 7:50 A.M. and assisted in that venture by executing a U-turn when the cat was spotted to permit Good a clear shot at the animal; b) that Stewart drove the car to which Good fled immediately after the murder; c) that Stewart and Good understood that Stewart would be waiting for Good on the east side of Maple Avenue at 11:45 A.M.; d) that Stewart knew that Good had a gun in his possession; and e) that Stewart knew Good had committed a crime involving a shooting before he reentered the car.

But critical further inferences accepted by the Supreme Judicial Court and pressed again by the Commonwealth before me are surmise.

The Supreme Judicial Court found itself conjuring—or, more accurately, appropriating without attribution virtually word-for-word from the Commonwealth's Appeals Court brief [7]—a series of speculative inferences about Stewart's prior intent to do harm to Perry from the very thin ingredients provided by Stewart's association with Good over the eleven hour period. The SJC asserted that:

> the defendant and Good had been driving up and down Cambridge Street over the course of several hours *looking for Perry so Good could shoot him;* that in the vicinity of the Perry's (sic) home a cat was killed to test the gun, to target practice, or *to pass the time during the "stake-out" for Perry;* and that the defendant *deliberately parked* on a side street near Cambridge Street, and *around the corner from where Perry was soon to pass, in order to facilitate a speedy escape after the murder.*

411 Mass. at 351, 582 N.E.2d 514 (emphasis supplied).[8]

Of course, Good did in fact personally encounter Perry alone; and, given the attendant circumstances, a rational juror could conclude that Good "at least briefly reflected on his resolution to kill the victim." *Commonwealth v. Good,* 409 Mass. 612, 619, 568 N.E.2d 1127 (1991). But no rational fact finder could draw the inference that "over the course of several hours [*Stewart* and Good were] looking for Perry so Good could shoot him," that they had set up a "stake out" for him, or that Stewart parked near "where [in advance he knew] Perry was soon

---

**6.** I note that the Appeals Court was prepared to draw inferences based on findings recited in *Commonwealth v. Good,* 409 Mass. 612, 618, 568 N.E.2d 1127 (1991), *see Commonwealth v. Stewart,* 30 Mass.App.Ct. 569, 573, 571 N.E.2d 43 (1991). I find it perplexing that the Appeals Court would rely on findings or inferences another appellate tribunal made in reviewing the evidence in a separate, albeit related, case. Neither the parties nor the courts can properly later import into an appellate record evidence not adduced before the finder of fact in the particular case under review. Of course, even relying on such material, the Appeals Court reversed the conviction. Needless to say, I rely only on the evidence in the trial of petitioner himself.

**7.** Because the Supreme Judicial Court took the case on further appellate review, the principal briefs before the SJC were those submitted by the parties in the Appeals Court. *See* Mass.R.App.P. 27.1(f) (unless further briefing authorized "cases in which further appellate review has been granted shall be argued on the briefs and appendix filed in the Appeals Court").

**8.** The parallel portion of the Commonwealth's brief reads as follows:

> the defendant and Good had been driving up and down Cambridge Street over the course of several hours with the intent to murder Robert Perry, that in the vicinity of the victim's home a cat was killed to test the gun, to target practice, or to pass the time during the "stake-out" for the victim, and that the defendant deliberately parked facing away from Cambridge Street and around the corner from where the victim was soon to pass in order to facilitate a speedy escape after the murder.

Brief and Supplemental Record Appendix for the Commonwealth at 20.

to pass." Each of these inferences depends upon some showing that Stewart had some knowledge of Good's intent to do harm to Perry—or someone in his circumstance—before Good shot him. But there is no evidence that this was so. There is no evidence to support the proposition that Stewart had any idea who Perry was in order to be "looking for" him,[9] let alone assisting in successfully bringing about his murder; there is no evidence to support the proposition that Stewart and Good were engaged in a "stake out," during which "time was passed"; there is no evidence to support the proposition that the car was "deliberately parked" with knowledge Perry was soon to pass nearby, let alone "in order to facilitate a speedy escape." All this is unballasted conjecture.

The failure to show Stewart had knowledge of an encounter with, or some other grounds for believing there existed, a potential human victim who was plainly and strongly at risk of death at the hands of Good and that he shared Good's malicious intent with respect to such a victim is fatal to the Commonwealth's joint venture theory against Stewart. *Compare Commonwealth v. Walsh,* 407 Mass. 740, 745, 555 N.E.2d 593 (1990) (overturning conviction for first degree murder and assault and battery in a case based on joint venture due to lack of evidence indicating that defendant knew principal had a knife or that principal harbored a grudge against victim) *with Casale v. Fair,* 833 F.2d 386, 389 (1st Cir.1987) (affirming conviction based on joint venture where defendants harassed victim prior to shooting and were present in playground where shooting occurred).[10]

9. Indeed the evidence is quite thin that "petitioner and Good had been driving up and down Cambridge Street over the course of several hours." The Commonwealth states that Good and petitioner were seen together "several times" between 1 A.M. and 12:00 noon the day of the murder and that "on each occasion, the petitioner and Good were seen driving on Cambridge Street, near the victim's residence." Respondent's Supp. Memo at 1. The direct evidence on which to base these statements is minimal. Stewart and Good were seen together four times on July 27, three times before the murder: (i) at 1:00 A.M. in the Night & Day bar, which was located on Cambridge Street; (ii) at 7:50 A.M. at the cat shooting scene on Cambridge Street; (iii) at about noon on Maple Avenue, which runs one way off Cambridge Street; and— after the murder—(iv) at the crash scene.

Although the bar was located at 1176 Cambridge Street and Maple Avenue is properly entered on the block where Stewart's car was parked only from Cambridge Street, the only time the two were seen "driving up [or] down Cambridge Street" was at 7:50 A.M., when Good shot the cat in front of the Harrington School. The next observation was four hours later when the car was seen parked, for how long a period of time there was no evidence. Moreover, these sightings—and particularly the parking location—were also near Good's residence, suggesting that travel along Cambridge Street to the vicinity of Maple Avenue was not simple trolling for victims, whether animal or human. Nevertheless, although I consider this conclusion to be at the outer reaches of reasonable inference, I am prepared to accept that some rational juror could draw the inference that Stewart and Good had been "driving up and down Cambridge Street over the course of several hours."

Similarly at or beyond the outer limits of the realm of reasonable inference is the implicit conclusion suggested in the assertion in the Supreme Judicial Court opinion and pressed before me by the Commonwealth that because "the murder occurred quickly after Good spotted Perry", *Commonwealth v. Stewart,* 411 Mass. at 352, 582 N.E.2d 514, Stewart must also have somehow spotted Perry. No evidence was produced at trial to indicate where Good or Perry were between the time the cat was shot at 7:50 A.M. and the time Good was seen running to Stewart's car at noon. Thus, there is negligible basis in the record for the SJC's conclusion that "the murder occurred quickly after Good spotted Perry." But, even assuming that Good's murder of Perry took place shortly after Good spotted the victim following Perry's 11:45 telephone call from near Inman Square, there is no evidentiary support for the proposition that Good was with Stewart when the former spotted Perry and moved to kill him.

10. The respondent contends that

the Commonwealth was not obliged to prove the petitioner and Good knew the victim, harbored ill will toward him, (sic) nor was it necessary to prove a specific intent to kill or to do grievous injury to the victim. Instead, the necessary shared intent of malice could have been established objectively by the inference that Good left the petitioner's car armed and that a reasonable person in petitioner's position would have known of the plain and strong likelihood that a death would follow the contemplated act.

*Respondent's [Second] Supplemental Memorandum of Law in Opposition to Petition for a Writ of Habeas Corpus,* at 3–4.

Under this formulation, the Commonwealth's case depends upon the reasonableness of the proposition that there was a plain and strong

The Commonwealth seeks to bolster its claimed entitlement to maintain this conviction on a joint venture theory of murder by reference to what may be termed the get-away-driver joint venture theory for robbery. In several cases the Massachusetts courts have held the driver of a get away car parked near the site of a robbery liable for the robbery itself. *See, e.g., Commonwealth v. Giang*, 402 Mass. 604, 609, 524 N.E.2d 383 (1988); *Commonwealth v. Seminara*, 20 Mass.App. 789, 801, 483 N.E.2d 92 (1985). But such cases have involved underlying circumstances of proximity to a site with no other apparent purpose than facilitating robbery. In contrast, parking a car near a companion's residence and waiting for him to return does not give rise to an inference that one shares the intent formed, however "briefly," by that companion to commit a murder on the way back to the car. There simply is no basis in the evidence here or in the nature of the crime to infer that Good, let alone Stewart, was "looking" for the victim for several hours on Cambridge Street or elsewhere or that they had staked him out.

As the two state appellate tribunals recognized, the evidence presented here bears some resemblance to that in *Commonwealth v. Mandile*, 403 Mass. 93, 525 N.E.2d 1322 (1988), where the SJC overturned a conviction for murder based on joint venture. There the evidence indicated that Mandile sat in his car in the victim's driveway while the principal, Patrick O'Brien, left the car and entered the victim's house. O'Brien remained in the house for 10 to 15 minutes during which time Mandile turned the car around to face the street and left it idling. *Id.* at 95, 525 N.E.2d 1322. After his arrest,

Mandile gave "inconsistent accounts of his activities on the day of the homicide." *Id.* at 96, 525 N.E.2d 1322.

Although there was "no dispute that the victim's murder was premeditated" (the victim was shot four times with a gun that had to be recocked each time), the Court concluded that the "critical issue is whether the jury properly may have inferred that the defendant acted with knowledge of a premeditated murder and with an intent to assist in committing the crime or whether, to the contrary, the Commonwealth only offered evidence of mere association, coupled with consciousness of guilt." *Id.* at 99–100, 525 N.E.2d 1322. In passing, the court noted that there was no evidence showing either that the defendant "instantly drove off," or that Mandile and O'Brien communicated. *Id.* at 101, 525 N.E.2d 1322. The Court thereupon overturned Mandile's conviction.

Attempting to distinguish *Mandile*, the SJC explained that the facts in *Stewart* indicate,

> the murder occurred quickly after Good spotted Perry, and there was evidence that Good ran to the defendant's automobile which had been parked nearby immediately after the murder. Moreover, there was evidence that the defendant instantly moved the automobile out of its parking space and accelerated rapidly without first conversing with Good.

411 Mass. at 352, 582 N.E.2d 514. But these factors, on which the Supreme Judicial Court here relied to indicate prearrangement and "to prove advance knowledge," are not adequately supported in the evidence of record[11]

likelihood the shooting death of a human victim—caused by an armed person, who four hours earlier had killed a cat with help from his companion—would follow from that person's departure from his companion's car at some point during the intervening four hours. In the absence of some further knowledge by the companion of the potential for a homicidal encounter, however, the likelihood of such a death cannot reasonably be said to be suggested, let alone plainly and strongly established, by such circumstances.

**11.** It strains the evidence to say that Stewart, whom the witness Thomas saw still maneuvering the parked car out of the space when he returned

to the window with paper to write down the license number, "instantly moved the automobile out of the parking space." Moreover, contrary to the assertion of the Commonwealth and the SJC, there was no evidence one way or the other that Stewart pulled out of the parking space on Maple Avenue after the shooting "without first conversing with Good." 411 Mass. at 352, 582 N.E.2d 514. One witness, Thomas, answered in the negative when asked, "did you hear any statements being made by the person *running* to the car?" (emphasis supplied). The other witness, Scott, said that the car moved immediately after Good got in it and that when the car passed him, Good was looking out the window. Neither witness, however, was asked about, or testified

and, in any event, would not provide a critical mass of direct evidence from which an inference of prior knowledge could be drawn rationally.

Whether or not the two spoke when Good entered the car, the fact that Stewart left the space in haste does not indicate that he knew that Good *intended* to kill Perry *before* the murder took place. Stewart, sitting as he was in a car parked on Maple Avenue with its engine off,[12] presumably heard the gun shots, given that other witnesses on Maple Avenue heard them. He may even have observed the victim cross Maple Avenue as Perry proceeded along Cambridge Street. Seconds later, Good ran down the street, gun in hand, to the car. Putting two and two together, Stewart would have realized that Good had shot someone or something. But this does not permit the conclusion that Stewart knew a homicide was likely to happen *before* it did, let alone that he shared Good's apparent intent to make it happen.

Finally, I find the fact that petitioner lied to the police officer at the scene of the car crash, stating that he was alone in the car, adds nothing significant to the collection of reasonable inferences. As in *Mandile*, evidence of consciousness of guilt through false exculpatory stories is not determinative. By the time petitioner drove Good away from Maple Avenue, there is little doubt that he knew, at the least, Good had discharged his firearm. Stewart's effort to protect Good after the fact, however, is insufficient to establish that he had a *prior* knowledge of his companion's intentions to commit murder.

The diaphanous quality of the circumstantial proof as to joint venture murder of Perry by Stewart becomes apparent when it is considered in connection with two crimes which the evidence would adequately cover for Stewart's conviction: participation in a joint venture to murder the cat[13] and being an accessory after the fact to the murder of Perry.[14]

There was an adequate basis to prove a joint venture in the murder of the cat from the evidence that Stewart as driver executed a U-turn after the cat came into view and slowed to permit his passenger Good some easy shots. But there is nothing from which to infer that Stewart similarly joined Good's intent to dispose of Perry, who, from the most that can reasonably be found on this evidence, merely happened to be walking on Cambridge Street only to have the misfortune to encounter Good alone.

Similarly, while there was evidence that Stewart facilitated Good's escape from the scene of the murder and thus was an accessory after the fact, there is no evidence he had any idea such an event would take place before the shots rang out. His prior intent to join in the murder of Perry or any other human being cannot be inferred from the earlier killing of the cat, the fact of the escape and the following clumsy effort to cover up his post-murder assistance of Good.

There is no doubt that the evidence here would support a conviction of Stewart for being a joint venturer in the killing of the cat or as an accessory after the fact to the murder of Perry. But neither is the crime for which he was convicted.

Absent evidence sufficient to ground the inference that petitioner shared Good's intention to kill Perry prior to the murder, I

---

to, whether or not Good and petitioner conversed when Good first entered the car. Nor is it clear that either witness was in a position to hear or see the two speaking. Thomas was in a third floor apartment above and behind the car. Scott was in a playground approximately 75 yards from the parked car. Thus, although the jury may have surmised that Good and petitioner did not speak before petitioner drove off, the inference is, as the Appeals Court observed, "premised upon an absence of proof rather than evidence and is, therefore, conjecture." 30 Mass. App.Ct. at 576, 571 N.E.2d 43.

12. If anything, the inference of premeditation is weaker here than in *Mandile* where the defen-

dant had turned the car to make an easier departure and kept the engine running *before* the murderer returned to the car.

13. Among the potential charges which could be pressed for the joint venture murder of the cat were Mass.Gen.L. ch. 272, § 77 (up to one year incarceration for killing an animal) and ch. 266, § 112 (up to five years incarceration for willfully and maliciously killing an animal).

14. Mass.Gen.L. ch. 274, § 4 (up to seven years prison sentence for one who assists principal felon with intent to thwart his arrest after commission of felony).

conclude that petitioner's murder conviction was based on insufficient evidence and must grant his habeas corpus petition.

## IV.

I have noted in the past the daunting institutional concerns and constraints which confront a federal judge addressing a well founded petition for a writ of habeas corpus by a prisoner whom the evidence shows has participated in repugnant criminal activity. *Oses v. Commonwealth,* 775 F.Supp. 443, 466–67 (D.Mass.1991), *aff'd,* 961 F.2d 985 (1st Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 410, 121 L.Ed.2d 334 (1992); *see also* Douglas P. Woodlock, *Attending to the Nation's Business Within the Commonwealth: A Brief Historical Survey of the Anomalous Role of the United States District Court in the Massachusetts Judicial System,* 1993 Annual Report of the Supreme Judicial Court Historical Society 77, 94–96. Those considerations come to bear here with special force because the sufficiency claim must be evaluated in light of state substantive law explicitly reviewed by the state's highest court.

I have, accordingly, in seeking to determine whether *any* rational juror could have found the essential elements of the crime as Massachusetts defines it beyond a reasonable doubt, given the greatest deference to applications of law to fact made by the Supreme Judicial Court.[15] After repeated review of the evidence of record and having solicited and received additional briefing and submissions from the parties directed to specific areas of difficulty which the record raises, I am left with the firm and fully considered conclusion that proof of the element of intent to assist in murder rests entirely on conjecture and surmise. Thus the conviction may not stand.

▬ Nor may Stewart properly be incarcerated any longer. He has already served more than the potential sentence for any crime for which he could be convicted on this evidence. *See* notes 13 and 14 *supra.* Moreover, the statute of limitations has run for any such crimes,[16] none of which could be retried as a lesser included offense of the charge of murder.[17] Consequently granting a conditional writ to permit retrial on other charges is not appropriate. The petitioner has been incarcerated longer than the evidence of his criminal conduct properly permits. Accordingly, I will issue the writ unconditionally, apart from staying the order for ten days to permit the Commonwealth to seek relief to prevent, or impose conditions upon, petitioner's release pending any appeal the Commonwealth may take. I decline, however, to countenance any further incarceration of a person who has been convicted on insufficient evidence.

## CONCLUSION

For the reasons set forth more fully above, I hereby grant the instant petition and vacate petitioner's conviction. The petitioner's release from custody is hereby stayed for 10 days from the date of this Order to permit respondent to seek a stay or the imposition of conditions of release pending appeal.

---

**15.** I note that the issue of the proper standard of review of a state court determination in connection with a habeas corpus proceeding in federal court generated some discussion in *Wright v. West,* —— U.S. ——, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992). This case does not require that I join that discussion because even having given the greatest deference to the final state court opinion, and without applying anything other than long settled principles for the limits to evidentiary inference, I conclude that *no* rational trier of fact could have found the requisite element of intent on this record.

**16.** Because none of the offenses identified in notes 13 or 14 *supra* are specifically enumerated in the general statute of limitations, Mass.Gen.L.

ch. 277, § 63, the residual six year limitation period found there is applicable.

**17.** The killing of the cat is, of course, a separate incident introduced at Stewart's trial for the joint venture murder of Perry not as direct proof of the elements of the Perry murder but to show Stewart's knowledge of Good's intent to kill Perry and Good's capacity to do so. *Commonwealth v. Stewart,* 411 Mass. 345, 354, 582 N.E.2d 514 (1991).

Under Massachusetts law, the crime of accessory after the fact to murder is not considered a lesser included offense of the crime of murder, *Commonwealth v. Talbot,* 35 Mass.App.Ct. 766, 777, 625 N.E.2d 1374, *further appellate rev. denied,* 417 Mass. 1101, 631 N.E.2d 57 (1994).